**Edward CAMERA, Petitioner-Appellant,**

v.

**Walter FOGG, Superintendent, Green Haven Correctional Facility, Respondent-Appellee.**

**No. 1512, Docket 81-2096.**

United States Court of Appeals, Second Circuit.

Argued June 5, 1981.

Decided Aug. 26, 1981.

Phylis Skloot Bamberger, The Legal Aid Society, Federal Defender Services Unit, New York City, for petitioner-appellant.

Robert A. Forte, Asst. Atty. Gen., New York City (Robert Abrams, Atty. Gen. of the State of New York, George D. Zuckerman, Asst. Sol. Gen., New York City, of counsel), for respondent-appellee.

Before LUMBARD and OAKES, Circuit Judges, and LASKER,* District Judge.

LUMBARD, Circuit Judge:

Edward Camera appeals from an order of the United States District Court for the Southern District of New York, Tenney, J., denying his petition for a writ of habeas corpus. After being tried in New York State Supreme Court along with his brother, Thomas Camera, and his cousin, Nicola Rinaldi, Edward and his codefendants were

---

* Honorable Morris E. Lasker, of the United States District Court for the Southern District of New York, sitting by designation.

convicted of kidnapping in the first degree, kidnapping in the second degree, assault, and petty larceny. At trial, all three were represented by the same attorney. Petitioner claims that the multiple representation of the defendants violated his Sixth Amendment right to counsel, applicable by virtue of the Fourteenth Amendment, because the defendants had conflicting interests which prevented counsel from properly representing the petitioner. Because we agree with the petitioner, we reverse and remand with directions to issue the writ unless a new trial is begun within ninety days.

## I.

As revealed in the transcript of the hearings held by the district court and in the district court's findings, the crimes for which petitioner was charged and convicted grew out of a rather bizarre series of events which occurred in late 1970 and early 1971, and which centered around Nicola Rinaldi. Robert and Barbara DiMatteo, the kidnapping victims, were business and social acquaintances of Rinaldi's who often came to Rinaldi's home in Staten Island to visit him and his wife Joanna. In July of 1970, the DiMatteos invested in a wholesale cigarette business in South Carolina. They were in need of funds, and Rinaldi loaned them $10,000 in the late summer or early fall of 1970; the agreement was that the DiMatteos would pay $200 per week until the $10,000 was repaid in full. During the fall, despite occasional disagreements concerning the loan, the Rinaldis and the DiMatteos saw each other a good deal socially.

About November 20, 1970, Rinaldi came home with a small safe which, with the help of his wife Joanna, he secreted in a closet in his attic. Rinaldi and his wife were having marital problems at this time. On November 25, Rinaldi called Barbara DiMatteo and asked her to come to his house. She found him waving a gun and looking as if under the influence of alcohol or drugs. He told her that he had had a violent argument with his wife Joanna and that she had left him, taking their two children. The next day, Joanna called Barbara to say that Ri-

naldi had committed himself to Kings County Hospital, apparently after giving the DiMatteos a set of keys to his home. Upon hearing that Rinaldi checked out of the hospital, the DiMatteos drove to his home and returned his housekeys on the 28th, at which time Rinaldi claimed some $12,000 was missing from the house. The DiMatteos returned to Rinaldi's for dinner on the 29th.

On the 30th, Robert DiMatteo left for North Carolina. On that same day, Rinaldi discovered that $65,000 had been removed from the safe in the attic. Rinaldi first contacted the police to whom he was apparently no stranger, and accused the police of the theft. After a conference at Rinaldi's house with Detective Cuff of the 122nd Precinct, some of Rinaldi's relatives and some neighbors, Rinaldi drove to the DiMatteos' home, forced Barbara into his car, and took out a gun. He accused her of stealing the money, and upon arrival at Rinaldi's home, took her to his basement and held the gun to her head. The gun discharged, but she was not harmed.

Rinaldi next decided that everyone he suspected of the crime should take lie detector tests. On December 1, at the office of a private investigator in Manhattan, Barbara DiMatteo and her father-in-law Philip DiMatteo were tested along with Thomas Camera, his brother Frank Camera, and Rinaldi's father. Later that day, Rinaldi brought his wife Joanna to the police for questioning.

At the hearings in the district court, Thomas Camera testified to his version of the events after the meeting at the private investigator's office. According to Thomas, Rinaldi drove him back to Staten Island and then accused him of having stolen the money. When they arrived, Rinaldi forced Thomas into the trunk of Rinaldi's car and drove him to Rinaldi's home. Rinaldi then dragged Thomas into a room which Rinaldi locked from the outside, questioning him about the money. According to Thomas, Rinaldi kept him prisoner in the room for approximately two weeks, tying his hands and feet at night. The district court, al-

though it accepted Thomas's version "with considerable skepticism," believed that the confrontation occurred on November 30, and not the next day.

On December 2, Philip DiMatteo suffered a heart attack. Barbara called her husband Robert to inform him of this, and Robert returned home shortly thereafter. On December 5, Rinaldi, who had been making daily visits to Detective Cuff at the 122nd Precinct, delivered to Cuff a list of suspects. The list included Rinaldi's parents, his sisters, his uncle, his brother-in-law, his cousins Frank and Thomas Camera, the DiMatteos, his neighbor and his wife; the petitioner was not included. Upon Robert DiMatteo's return to New York, Rinaldi brought the DiMatteos to Detective Cuff for questioning and fingerprinting. A week later, during a social visit to Rinaldi's home, Robert was also given a lie detector test.

Thomas Camera, who was 19 at the time of these events, remained at Rinaldi's home through December. He was not tied up, however, after the initial period, and was allowed out during the day. During this period Thomas was in contact with his family. There was some evidence that Thomas was using drugs at the time. Thomas and Edward testified in the district court that Edward came to visit Thomas at Rinaldi's home. Thomas told Edward, who was 21 at the time, of Rinaldi's actions, and his continued abuse and threats. According to Edward, Rinaldi told him that Thomas's lie detector test had turned out badly and that Rinaldi believed that Thomas had stolen the money. Edward unsuccessfully tried to get Rinaldi to let Thomas go. Edward told Thomas that the family would do what it could, but it was difficult since Rinaldi was "a little crazy" at the time.

The events surrounding the kidnapping itself began with Rinaldi's phoning the DiMatteos on New Year's Day to invite them to drop by his house after dinner for a drink. During December, Robert DiMatteo had spoken to Rinaldi only occasionally, again protesting his innocence. Barbara had avoided Rinaldi, although she remained in contact with Joanna Rinaldi. After dinner, the DiMatteos departed in their car to visit Rinaldi. On the way, they were passed by Rinaldi's car, and when they arrived at Rinaldi's home, Rinaldi and Thomas Camera put guns to their heads and got into the DiMatteos' car. Rinaldi said that someone knew that Robert had stolen the money.

With Rinaldi driving and Thomas sitting in back, pointing a gun at Barbara, the four drove to the Camera home. Rinaldi blew the horn, then got out of the car. Shortly thereafter, Edward Camera, the petitioner, came out of the house with a gun and a small briefcase. Hoods were placed on the DiMatteos' heads. The group were driven to a house at an unknown address. On the way Robert was left alone for a moment and removed his hood, enabling him to see his wife being forced into a barrel by the three men. Robert moved toward the barrel, but was shot by Edward. Robert was then tied up by Edward and Thomas. Rinaldi told him he would let the two go if they paid the $65,000; later, he stated that he wanted $100,000. Robert told Rinaldi he had no money. He asked that his hands be untied as he was having difficulty breathing. Edward Camera cut Robert's clothes down the back to permit him to breathe. Rinaldi during this time was threatening Barbara and demanding money from her or her father-in-law Philip DiMatteo. She was forced to call her father-in-law and request him to pay $58,000 in specified denominations.

After Barbara pleaded with Rinaldi and the Cameras to release her husband and take him to a hospital, they agreed to do so, but to keep her under their control. Thomas and Edward took Robert to a hospital in Brooklyn, and left him there, returning to meet Rinaldi and Barbara. At the hospital, Robert DiMatteo was questioned by police detectives. He asked to speak with Detective Cuff, but Cuff was out sick and was not contacted until the early afternoon of January 2.

When the Cameras returned from leaving Robert at the hospital, the three men took Barbara, with a paper bag over her head, to

the Manhattan Beach Hotel, in the early morning hours of January 2. After Rinaldi registered for a room, Thomas escorted Barbara into the hotel. Apparently, Edward and Rinaldi then left the scene. Thomas remained with Barbara in the hotel room, where she was tied up with adhesive tape and placed on a bed. At some point, Thomas allowed her to go to the lavatory and slit the tapes securing her. While in the bathroom, she tore the tapes off and hid them.

Late in the afternoon of the 2nd, Thomas received a call, and then released Barbara. The call was probably from Rinaldi telling Thomas to release Barbara. Rinaldi had appeared in the 122nd Precinct House after Cuff, finally contacted by Robert DiMatteo who related the events of the past two days, told Rinaldi's uncle that Rinaldi should come immediately to the precinct house. Cuff demanded that Rinaldi produce Barbara at the precinct house within an hour. Rinaldi went to a bar where he made a phone call, presumably to Thomas Camera.

Rinaldi and Edward and Thomas Camera were charged with three counts of kidnapping in the first degree: first, with abduction of Barbara DiMatteo with intent to compel ransom, second, with abduction of Robert DiMatteo with intent to compel ransom, and third, with abduction and detention of Barbara DiMatteo for twelve hours with intent to terrorize. The three were also charged with assault in the first and second degree for injuries to Robert DiMatteo and with the theft of personal property of the DiMatteos including their automobile. Finally, Edward was charged with possession of a loaded weapon.

At arraignment on the indictment, on January 15, 1971, the three defendants were represented by Joseph Panzer. Panzer represented the three until sometime after May 3 when Jacob Lefkowitz was retained to replace Panzer. Apparently, Panzer was dismissed because he wished the defendants to take a plea. Lefkowitz was hired and paid for by Rinaldi's father. He had worked for a company with which Rinaldi's father was associated. He was also representing Thomas Camera in another matter relating to illegal smuggling of untaxed cigarettes.

According to Lefkowitz, he conferred with the defendants together and individually in order to determine whether there was any conflict of interest between the defendants. The district court did not accept the Cameras' testimony that they never met with Lefkowitz alone. In any event, Lefkowitz, believing the stories told by the defendants, decided that the best strategy to take at trial would be to deny that the kidnapping ever occurred.

Trial commenced on June 2, 1971 before Supreme Court Justice Vito Titone. In his opening statement to the jury, Lefkowitz said that the evidence would show that no kidnapping occurred, that the DiMatteos had simply been visiting Rinaldi on the date in question, and that the kidnapping was a figment of DiMatteo's imagination. He said Robert had been shot in an accident and had asked Thomas and Edward to take him to a Brooklyn hospital so the police would not know of the injury. Finally, Lefkowitz told the jury that Barbara and Thomas Camera had been having an affair and went to the Manhattan Beach Hotel together to spend the night.

Robert DiMatteo testified first and gave his version of the events of January 1st and 2nd, which supported the charges against the defendants. Barbara testified next. After she testified to the same events, a recess was called during which there was a conference in the Judge's chambers. At the recess, the prosecution turned over Barbara's grand jury testimony. Included in that testimony was a comment that Barbara knew that Thomas had been "taken prisoner" by Rinaldi.

Also at the conference, the prosecution stated that after the recess, it would seek to introduce into evidence a sweater which Barbara wore on January 2, and the tape which had been removed from her wrists at the hotel and which had subsequently been recovered. Attached to the tape were yarn remnants which matched the material of

her sweater. The physical evidence was devastating to the defense Lefkowitz had sought to put forward. He asked for permission to hold a conference with the defendants and their families. He stated that a conference was necessary because there was "a possibility of conflict of interest" and that "although they say to me one thing, I want them to say it in front of the parents and the wives ... because ... there could very well be a conflict if they are not telling me the truth." Justice Titone indicated that he was willing to accept a plea to a lesser offense, but only if all defendants agreed to plead.

At the meeting with the defendants and their families, Lefkowitz discussed the plea possibilities. He told defendants of the lesser crimes to which they could plead and their penalties. Although Edward Camera indicated that he wanted to plead, Rinaldi remained firm in his refusal. When Rinaldi's mother asked Lefkowitz whether a plea by one would hurt the others, and Lefkowitz replied in the affirmative, Edward said he would go along with the trial. Lefkowitz made one last attempt to convince the defendants to take the plea after the defendants had been returned to the holding pen. According to Edward Camera, Rinaldi screamed at him that he wanted to go to trial and that had he wanted to plead he could have done so when Panzer was his attorney.

The trial continued with the damning evidence introduced. In defense, Lefkowitz called four witnesses: a desk clerk and porter from the Manhattan Beach Hotel, a friend of the Rinaldi's who implied that Barbara in fact stole Rinaldi's money, and Joanna Rinaldi who testified as to the deteriorating state of the DiMatteos' marriage. The jury found all three defendants guilty of kidnapping in the first degree for abduction and detention of Barbara DiMatteo for twelve hours with intent to terrorize, of two counts of second degree kidnapping, of

second degree assault, and of petit larceny. Mandatory fifteen year penalties for first degree kidnapping were imposed on all three defendants with the sentences on the other crimes to run concurrently. A motion for a new trial was denied by Justice Titone.[1]

In 1976, petitioner moved in state court to vacate his conviction on the ground that he had been denied effective assistance of counsel due to the multiple representation. Edward alleged further that due to a conflict of interest, his attorney had failed to put forth a defense: that Edward could not have been found guilty of abducting and detaining Barbara with intent to terrorize her, since he had left the hotel immediately after dropping her off and knew nothing as to subsequent events. The motion to vacate was denied. Although reargument was later granted due to developments in Thomas Camera's federal habeas suit, discussed below, the granting of reargument was retracted upon the Appellate Division's affirmance of the judgment of conviction. Edward Camera then filed his first petition for habeas corpus relief in district court.

Thomas Camera, in the meantime, had filed his own federal habeas petition. He too alleged a denial of effective assistance of counsel because of the multiple representation. In the course of proceedings on this matter, the State agreed that there was nothing on the record which demonstrated that Justice Titone had informed the defendants of their right to separate counsel or their right to assigned counsel. It was this admission which influenced the state court originally to grant rehearing of Edward Camera's motion to vacate his conviction. In any event, the district court ruled that Thomas's petition would be dismissed unless he could allege specific instances of prejudice from the multiple representation.

Thomas Camera then secured the services of a Legal Aid attorney. In December

1. The motion was made some months after trial when Robert DiMatteo, now estranged from his wife, wrote out a statement declaring that there had been no kidnapping. He was evidently attempting to have the defendants released in order to terrorize Barbara. There was also some question as to the bias of one of the jurors. At the hearing on the motion, Edward was now represented by his own counsel.

1977, the attorney visited both Cameras at Green Haven State Prison. In the course of this visit, the attorney elicited information which supported a defense that both Cameras acted under duress from Rinaldi, a defense which was never raised at trial. The attorney concluded that the duress defense could have been proven by the evidence of Rinaldi's captivity of Thomas, his threats to both brothers, and Edward's statements that he had been induced to participate through fear of Rinaldi's possible behavior toward his brother.

When the allegations of the failure to raise the duress defense were presented on Thomas's behalf, the district court, noting that the claim had never been made in state court, dismissed for failure to exhaust state remedies. Thomas then brought a motion to vacate his conviction in state court pursuant to § 440.10 of the New York Criminal Procedure Law.

In the meantime, Edward Camera's writ of habeas corpus was denied by Judge Tenney on February 13, 1979. Edward had asserted that a potential defense—that of abandonment or lack of requisite intent as to the detention of Barbara in the hotel was not raised by Lefkowitz due to the conflicting interests of all three defendants. The court held that such a defense was patently frivolous; it noted that Edward had been present at the start of the abduction to the hotel and participated fully in the kidnapping from the beginning. Therefore, no prejudice from multiple representation was demonstrated.

On April 11, 1979, a hearing was held in State Supreme Court on Thomas Camera's § 440.10 motion. When the case was called, the court was informed that the State was consenting to the vacating of Thomas's conviction, and that Thomas would plead guilty to a lesser offense for which the time already served would suffice as his sentence. In stating the reasons for agreeing to vacate his conviction, the Assistant District Attorney stated that there was "no direct indication" in the record that defendants were warned "of the risks of representation at the time of trial by one lawyer of three defendants," although such warnings may have been given off the record. He also stated that in light of the fact that the attorney's fees were paid by one defendant's father, and the fact that there was an incipient conflicting defense—that of duress—available to Thomas, a new trial would probably be necessary. He concluded that the State did not wish to undergo such a trial and noted Thomas's young age at the time of the crimes and the more substantial participation of Rinaldi, as well as that of Edward who shot one of the kidnap victims.

In light of these developments, Edward Camera, now represented by separate counsel, in August of 1979 brought a second petition for habeas corpus in the district court. He again asserted that the multiple representation had denied him effective assistance of counsel. He alleged that Lefkowitz had conferred alone with Rinaldi on many occasions, had devised a strategy most beneficial to Rinaldi, and had suppressed the defense that both the Cameras were acting under duress. The district court held two days of hearings on the petition, at which the Cameras, Lefkowitz, and Judge Titone testified. The Cameras both testified to Thomas's detention by Rinaldi. Thomas testified that even after being held captive, he acted in fear of Rinaldi. Edward Camera testified that Thomas had told him of his confinement and his fear. He also testified that when Rinaldi came to his house on the day of the kidnapping, Edward resisted the plan, but went along only after Rinaldi stated that Thomas would be "hurt" if he did not do so.

The Cameras also testified that they returned to Rinaldi after taking Robert DiMatteo to the hospital only out of fear that Rinaldi would eventually find them. The Cameras testified that at their trial they had not been told of their rights to assigned counsel, although Edward admitted that he had once been charged in a criminal matter and had applied for assigned counsel, but had been turned down due to his income. As for the plea, both testified that Rinaldi was adamant about going to trial. Thomas testified that he was unsure at the time

whether or not to plead, but that Edward wanted to do so.

Lefkowitz testified that he had spoken to each defendant alone and determined that no conflict existed, and so informed Justice Titone. He testified that he told the defendants of the possibility of obtaining separate counsel. He did not discuss possible conflicts, at least in those terms, because he doubted whether they understood what a "conflict" was. Justice Titone testified that, because of the need to use his chambers during the trial for conferences, these conferences were off the record. He testified, however, that he had in fact advised the Cameras as to their rights to separate retained or assigned counsel. He stated that he was assured by Lefkowitz that there were no conflicts of interest between the various defendants. He also said that his policy at the trial had been that he would accept a plea only if all three defendants pleaded.

The district court denied the second petition for habeas relief. It ruled that under the governing standard of *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), Edward had to prove an actual conflict of interest which adversely affected his lawyer's representation. The court ruled that no such showing had been made since Lefkowitz had never been aware of the possibility of a separate duress defense. No one had ever informed him of information suggesting such a defense. The only evidence at trial was a brief mention in Robert DiMatteo's trial testimony and in Barbara's grand jury testimony, yet Lefkowitz could be excused from paying any attention to these, particularly since he was under the impression that Rinaldi was caring for Thomas because of Thomas's drug problems.

The court also found that petitioner was repeatedly told by Lefkowitz and Judge Titone that he could secure separate counsel, even though neither had information leading them to believe there was any conflict. Finally, the district court held that under its reading of New York law, no duress defense was possible even if the

facts were as testified to by the Cameras. As to the other alleged inadequacies of the representation, the district court held that the attorney was also unaware of any information leading him to believe Edward had a defense to the first degree kidnapping charge because he left Thomas and Barbara DiMatteo at the hotel and did not participate any further in the crime. As to the difference in the defendants' views regarding guilty pleas, the district court found that Lefkowitz had been told that the judge would accept guilty pleas only if all three defendants agreed to plead, and that Edward decided not to plead upon learning of possible adverse effects on the others.

## II.

■ As the district court noted, the Supreme Court in *Cuyler v. Sullivan, supra,* held that multiple representation of a defendant in state criminal proceedings constitutes a violation of a defendant's Sixth Amendment right to counsel where "an actual conflict of interest adversely affected his lawyer's performance." 446 U.S. at 348, 99 S.Ct. at 1718. Once a party demonstrates such an "actual conflict," no further showing of prejudice is required. *Id.* at 349–50, 99 S.Ct. at 1719–20. We believe that there was such a conflict here and that it adversely affected Camera's representation.

Although the Supreme Court has not defined what an "actual conflict" entails, there are some indications given in the *Cuyler* opinion. First, the Court referred to the fact that a violation of Sixth Amendment rights occurs if "counsel actively represented conflicting interests." *Id.* at 350, 99 S.Ct. at 1719–20. Moreover, the Court elucidated the standard by comparing two of its earlier opinions. In *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), the Court held that multiple representation violated a defendant's constitutional rights when the record showed that defense counsel failed to cross-examine a prosecution witness whose testimony linked the defendant with the crime and failed to object to arguably inadmissible

evidence. The Court in *Glasser* found that these omissions resulted from a desire to protect a codefendant. On the other hand, in *Dukes v. Warden*, 406 U.S. 250, 92 S.Ct. 1551, 32 L.Ed.2d 45 (1972), the Court found no constitutional violation where Dukes pleaded guilty on the advice of two lawyers and later discovered that one of them, representing Dukes's codefendants on an unrelated charge, sought leniency in sentencing by arguing that the codefendants' cooperation with police led Dukes to plead guilty. As stated in *Cuyler*, the Court in *Dukes* failed to find anything in the record which indicated an "actual lapse in representation." 446 U.S. at 349, 99 S.Ct. at 1719.

█ Applying these principles here, we believe that Lefkowitz's representation of these three defendants invqlved, from the start, representation of conflicting interests, and that the conflict became apparent for all to see at the time the prosecution offered to introduce the severely damaging physical evidence and in the resulting discussion regarding possible guilty pleas with the defendants. To begin with, Rinaldi's interests differed from those of the Cameras. There is no question that Rinaldi's degree of culpability was much greater than that of the others. Rinaldi was a violent, unpredictable character who kept the Cameras, and everyone else who knew him, in constant fear. The potential duress defense of the Cameras was supported by evidence of this violent nature and evidence of Rinaldi's rather bizarre behavior in the weeks preceding the kidnapping. To protect Rinaldi, however, counsel was forced to minimize the effect of this evidence, to prevent its admission, and to attempt to establish a rather implausible theory that no kidnapping had occurred.

We believe it unnecessary to determine whether or not a defense of duress could have been established, for such an inquiry goes to the question of prejudice, an issue which the Supreme Court has held we need not reach. It is sufficient to point out that the defense could have been raised, and that there was a basis for it, and that it would have served to disassociate the Cameras from Rinaldi whose interests clearly diverged from the Cameras'. It was in their interest to admit some of the damaging facts, and place the blame on Rinaldi. Our finding of an actual conflict of interest adversely affecting representation is supported by the fact that the lawyer was chosen and paid for by Rinaldi's father. Moreover, given Rinaldi's personality, there is reason to believe that the Cameras' fear of Rinaldi continued after the kidnapping up to and including the time of trial.

The district court held that no actual conflict existed because counsel was not aware of facts which would lead him to believe there was any such conflict. We disagree. Lefkowitz should have realized that there was more to the case than the flat denials he apparently received from the defendants. He knew that Rinaldi's father was paying his fee. It was clear that Rinaldi was the most active codefendant and was the likely leader of whatever had occurred. Counsel knew of Thomas Camera's being under the influence of Rinaldi. Even if, as the district court believed, counsel had no direct evidence of Thomas's confinement, counsel believed that Thomas was in Rinaldi's care so that Rinaldi could assist him in getting rid of certain drug problems. Lefkowitz, however, chose to ignore these factors and adhere to the implausible story upon which Rinaldi insisted.

The conflicting interests between Rinaldi and the Cameras, as well as the continued domination of the Cameras by Rinaldi, became clear at the time of the prosecution's offer of physical evidence and the resulting plea discussion. The prosecution's offer of evidence revealed to Lefkowitz that the stories he had been told were obviously false. There was now a strong possibility of conflicting interests, and Lefkowitz so told the judge. During the ensuing discussions with defendants and their families, Edward Camera stated that he wished to take a plea. He was overruled in effect, by Rinaldi, who refused to consider a plea. After having told the judge that a conflict probably existed, and then being told by one defendant that he wished to take a plea and

by another that he would not, thus forcing the first not to take a plea, Lefkowitz was plainly confronted with a conflict.

Moreover, at the time of these discussions, the existence of a conflict should have been amply obvious to the trial judge himself. In *Cuyler, supra,* the Supreme Court held that trial judges must make an inquiry into the propriety of multiple representation where the judge knows or reasonably should know that a conflict exists. 446 U.S. at 347, 99 S.Ct. at 1718. As in Lefkowitz's case, there may have been sufficient evidence *before* the prosecution's offer of proof to put the judge on notice of the diverging interests. Nevertheless, there can be no doubt that such facts existed at the time of and immediately after this offer. The judge testified in the district court that he was aware that the defendants were unsure about the advisability of taking pleas and that there was no unanimity among the defendants on this issue. It was clear from trial testimony that Rinaldi was the ringleader. The now discredited story offered by the defense, the defense counsel's mention of the resulting possibility of a conflict of interest, and the difference of opinion as to pleading noted by the judge should have led him to inquire carefully into the conflicts. The judge's suggestions that separate counsel could be obtained were not sufficient to protect the rights of Edward Camera.

The district court held that the plea discussions evidenced no conflicts of interest because the judge had stated that he would only accept a plea from all three of the defendants. We fail to see how this highly improper ruling somehow operated to remove any conflict of interests. If anything, it was a recognition that certain defendants were more disposed toward pleading than others. The judge's requirement of unanimity merely exacerbated Lefkowitz's difficulties in adequately representing all three defendants and demonstrated the im-

possibility of his doing so. Separate counsel would have been better able to obtain separate consideration.

We believe that the totality of circumstances amply demonstrates the actual conflicts of interest which existed throughout. Lefkowitz was retained and paid for by one defendant. That party was clearly more culpable and was the leader of the group. There was a strong likelihood that the other co-defendants remained in fear of him. The defense presented was a flimsy one, which was completely undermined by the prosecution's offer of physical evidence demonstrating that a kidnapping had occurred. In discussing plea possibilities, it was clear that the defendants had different views of their interests, and that the leader of the group resisted any attempt by his codefendants to undermine his position. There was a duress defense which could have been raised had there been separate counsel and which could not have been raised with one counsel representing all three. Given all these factors there was clearly an actual conflict of interest which adversely affected the representation of the Cameras and Rinaldi by the same counsel.

The facts of this case are quite similar to others in which conflicts were found where codefendants were forced to take unified defenses despite the fact of varying degrees of culpability. In *Austin v. Erickson,* 477 F.2d 620 (8th Cir. 1973), an actual conflict was found where a woman accused with her husband of killing her child was represented by the same attorney as her husband, and the evidence revealed that the husband alone had perpetrated the acts resulting in the child's death. Similarly, in *Foxworth v. Wainwright,* 516 F.2d 1072 (5th Cir. 1975) and *United States ex rel. Bermudez v. Vincent,* 472 F.Supp. 448 (S.D.N.Y.1979),[2] multiple representation was found constitutionally infirm where unified defenses were taken, yet the evidence suggested that the

2. *Vincent* was reaffirmed by us after being remanded by the Supreme Court in light of *Cuyler. See* 614 F.2d 1285 (2d Cir. 1979), *vacated in light of Cuyler v. Sullivan sub nom. Harris v.* *Bermudez,* 446 U.S. 962, 100 S.Ct. 2935, 64 L.Ed.2d 819 (1980), *aff'd without opinion,* 657 F.2d 262 (2d Cir. 1981), *cert. denied,* —— U.S. - -- , 101 S.Ct. 3066, 69 L.Ed.2d 431 (1981).

crime was committed by only one person. Finally, in *United States ex rel. Hart v. Davenport*, 478 F.2d 203 (3rd Cir. 1973), a conflict was found where an employee had been represented by an attorney paid for by his codefendants who were his employers. Although some of these cases were decided upon standards more constitutionally demanding than that imposed in *Cuyler, supra,* they suggest the likelihood of a conflict of interest when a defendant is required to go along with a unified defense despite facts which suggest differences in relative culpability.

The conflicts of interest found here did not "adversely affect[ ]" Rinaldi's representation within the meaning of *Cuyler, supra.* Indeed, Lefkowitz's entire efforts appear to have been devoted to protection of Rinaldi's interests at the expense of the Cameras. The strategy pursued at trial was the one Rinaldi wanted and the only one possible for him. The failure of the others to plead or to testify about what had happened were of benefit to Rinaldi. It was protection of Rinaldi that caused the Cameras to forego their own defenses which might have led the jury to disassociate them from Rinaldi and find them guilty of lesser crimes.

 The State argues that, despite these conflicts, the defendants were aware of the problems of joint representation but adhered to their choice of counsel, thereby waiving any objections concerning their representation. We disagree. To begin with, criminal defendants are almost never qualified to decide such questions for themselves. Moreover, whether or not Lefkowitz ever spoke with the defendants separately, he never explained the problems of multiple representation in any way which would make clear to the Cameras how their different interests might be affected by

multiple representation. Lefkowitz testified that he never used the term "conflicts" because he thought defendants would not understand the term. He may well have said that they could arrange for separate counsel, yet such advice would be meaningless where defendants would not be able to see the need for such counsel and where they may have been in some fear of Rinaldi's reaction.

Under circumstances such as here existed it is immaterial whether or not the defendants were advised of their rights to separate counsel. No defendant, save perhaps one who is a lawyer familiar with criminal cases, can be expected to understand the dangers and disadvantages of multiple representation. If defendants who consented to or acquiesced in multiple representation were held to waive their rights to object to such representation where it later develops that there has been a conflict of interests, such as here existed, their Sixth Amendment rights of counsel would be of little value. We conclude there was no waiver of Camera's rights.

This case well illustrates the extreme hazards of multiple representation in the defense of criminal cases.[3] *See United States v. Carrigan*, 543 F.2d 1053, 1057 (2d Cir. 1976) (Lumbard, J., concurring); *United States v. Mari*, 526 F.2d 117, 119 (2d Cir. 1975) (Oakes, J., concurring); *Morgan v. United States*, 396 F.2d 110 (2d Cir. 1968). *See generally* Geer, *Representation of Multiple Criminal Defendants: Conflicts of Interest and the Professional Responsibilities of the Defense Attorney*, 62 Minn.L.Rev. 119 (1978); Note, *Developments in the Law—Conflicts of Interest in the Legal Profession*, 94 Harv.L.Rev. 1244, 1384–1395 (1981). In every case there are numerous

---

3. This principle was recently recognized by an amendment to the Federal Rules of Criminal Procedure, effective December 1, 1980. Rule 44(c) states:

JOINT REPRESENTATION: Whenever two or more defendants have been jointly charged pursuant to Rule 8(b) or have been joined for trial pursuant to Rule 13, and are represented by the same retained or assigned counsel or by retained or assigned counsel

who are associated in the practice of law, the court shall promptly inquire with respect to such joint representation and shall personally advise each defendant of his right to the effective assistance of counsel, including separate representation. Unless it appears that there is good cause to believe no conflict of interest is likely to arise, the court shall take such measures as may be appropriate to protect each defendant's right to counsel.

critical, strategic decisions which must be made by an individual charged with a crime, such as whether to become a witness for the State and against his partners in crime, whether to plead guilty to lesser offenses, and whether to take the stand in his own behalf. These decisions can be adequately made only by a defendant who is represented by an attorney who is uncompromisingly dedicated to the interests of that one defendant. Moreover, in many situations, such as the one here, there will be different degrees of culpability, and as a result, different defenses and considerations which may be raised on behalf of each defendant. Often related to that problem, there is a great likelihood in any multiple representation situation that one defendant may attempt to override the will of the others. This is particularly so where one defendant assumes the burden of paying counsel fees for all.

As the record demonstrates, there was a clear conflict of interest which deprived petitioner of effective representation. We therefore reverse and remand with directions to issue the writ unless a new trial is commenced within ninety days.