**UNITED STATES of America ex rel. John SULLIVAN**

v.

**Julius T. CUYLER, Superintendent State Correctional Institution Graterford, Pennsylvania**

**and**

**The District Attorney of Philadelphia County.**

Civ. A. No. 77–2527.

United States District Court, E.D. Pennsylvania.

Dec. 16, 1982.

See also D.C., 530 F.Supp. 1353.

---

### MEMORANDUM AND ORDER

JOHN MORGAN DAVIS, Senior District Judge.

Before the court are both petitioner's and respondent's objections to the proposed Findings and Recommendation of Magistrate Edwin E. Naythons which determined the merits of this habeas corpus petition. As the magistrate conspicuously noted, this case is well-travelled. Yet, I suspect it is destined to continue the evitable journey upward to the pinnacle of the appellate

courts. Nevertheless, it is my duty to make a *de novo* determination of those portions of the findings and recommendation to which objection is made pursuant to 28 U.S.C. § 636(b)(1) (1982). See Local Rule 7 IV(b). This duty, of course, is compelled by Article III of the Constitution. See gen., *United States v. Raddatz*, 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980).

In making this determination, I have reviewed the entire record in this case which includes: (1) the trial transcript;[1] (2) the Post Conviction Hearing Act transcript;[2] (3) the habeas corpus hearing transcript;[3] (4) all briefs and memoranda submitted by counsel; and (5) all prior opinions issued by state and federal courts. Oral argument was heard on November 18, 1982. A careful and independent review of the entire record of this case convinces me that the learned Magistrate's conclusion that the petitioner was deprived of the effective assistance of counsel is correct and the writ must issue. Because the learned Magistrate set forth his rationale in skillful detail, the court approves and adopts his findings and recommendation as if fully set forth herein. I write separately only to address the specific objections raised by the parties.

Preliminarily, I note that the petitioner's objection to the Magistrate's consideration of the sufficiency of the evidence issue is specious. By Order[4] this court referred the case to the Magistrate for the evidentiary hearing previously ordered by this court.[5] In addressing the sufficiency of the evidence issue the Magistrate merely followed the mandate of the court of appeals which directed that this issue be considered in the first instance.[6] In any event, after an independent review of the state court trial record, I conclude that the evidence was constitutionally sufficient to sustain the conviction under *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) and adopt the reasoning of the learned Magistrate.[7]

Both the petitioner and the respondent present a general challenge to the numerous findings made by the Magistrate based upon a lack of evidence in the record and erroneous credibility determinations. I have reviewed each of the objections independently and I find them without merit. While I unequivocally have the power to accept or reject the Magistrate's findings, or to recall witnesses and receive further evidence,[8] I have no doubt as to the soundness of the Magistrate's credibility findings based upon his ability to hear and view the witnesses[9] and his cogent reasoning. It must be remembered that in effective assistance of counsel cases, it is necessary to probe the decision-making process of counsel. Moreover, the Magistrate in this case was trying to reconstruct a sequence of events which occurred over fifteen years

---

1. The trial began on June 7, 1967.

2. The *coram nobis* hearing was conducted on various dates from April through June 1974. 19 Pa.Con.Stat.Ann. § 1180–1–14 (West Supp. 1982).

3. This court ordered the magistrate to conduct the evidentiary hearing pursuant to 28 U.S.C. § 636(b)(1)(B). Docket No. 49 (dated April 19, 1982).

4. See supra at n. 3.

5. See *United States ex rel. Sullivan v. Cuyler*, 530 F.Supp. 1353, 1358 (E.D.Pa.1982). The reasons set forth in my prior opinion dispose of the respondents' argument that this court is bound by the state court findings under *Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981).

6. *United States ex rel. Sullivan v. Cuyler*, 631 F.2d 14, 15, 16 (3rd Cir.1980).

7. The petitioner's other quarrel with the Magistrate's conclusion is that it is tainted by extraneous evidence not adduced at trial. But plainly the Magistrate properly limited his review of the sufficiency of the evidence to "the facts upon which the conviction is based...". Findings and Recommendation at 22. Moreover, my independent conclusion that a rational trier of fact could have found the petitioner guilty of the crimes beyond a reasonable doubt is based solely on the evidence adduced at the trial.

8. See 28 U.S.C. § 636(b)(1)(B).

9. The "power of observation often proves the most accurate method of ascertaining the truth." *United States v. Oregon Medical Society*, 343 U.S. 326, 339, 72 S.Ct. 690, 698, 96 L.Ed. 978 (1952).

ago. Consequently, in many instances a web of circumstantial evidence must be used to uncover the ultimate facts. In reviewing the Magistrate's findings, I cannot say that they lack a sufficient evidentiary basis to require their outright rejection or reception of further evidence on any point.

■ With regard to petitioner's objection to the admission and accreditation of certain hearsay testimony implicating him in various illegal activities, I find no error. Because the evidence was not offered to prove the truth of the matters, but to shed light on the prosecution's theory, it is not hearsay. Fed.R.Evid. 801(c).[10] Furthermore, this evidence is relevant to show the Commonwealth's possible theory of prosecution and possible lines of cross-examination. The record contains sufficient evidence that the Commonwealth believed these accusations and was prepared to challenge the defense at trial with them. E.H. at 42–44 (June 1, 1982); E.H. 55–60 (June 21, 1982). Similarly, I do not agree that the record is devoid of any evidence tending to indicate the defense's knowledge of the Commonwealth's theories or potential lines of cross-examinations; i.e. prior convictions, which could have affected the tactical decisions of the defense. The petitioner's criminal record was available to the parties, known to the union membership, and, in fact, stipulated to in the penalty phase of the case. The defense was well acquainted with all the union witnesses in the case, and employed an investigator who interviewed most of these witnesses. Moreover, the defense counsel were generally cognizant of the criminal records of other union members interviewed by the police. E.H. at 12 (May 7, 1982). Thus, as the Magistrate noted, to ascribe such wholesale ignorance to a well prepared defense is ludicrous. See Findings and Recommendations at 20 n. 22. Peruto, in fact, testified that factors other than petitioner's meritricious relationship influenced the decision not to put forth a defense. Id. at 26. E.H. at 51 (May 12, 1982). The Magistrate was well within his mission as the fact-finder when he found based upon the circumstantial evidence in the record, that the attorneys for the defense were aware of the petitioner's prior convictions and the rumors among the union rank and file of his illegal activities.

■ Finally, petitioner's objection to the Magistrate's consideration of the statements of witnesses outside the union hall at the time of the shooting is meritless. The statements are part of the record, and prompted an Order by this court concerning their discoverability. They were properly considered by the Magistrate in assessing Peruto's credibility. The remaining objections made by the petitioner are equally meritless and do not warrant discussion.

■ The respondent's objections are essentially reduced to two areas of dispute. First, the Magistrate's credibility determinations regarding Peruto's concern for the interest of his client, Carchidi, and Carchidi's desire to participate in the defense of the petitioner are attacked as erroneous and internally inconsistent. Second, the respondent assails the Magistrate's conclusion of law that an actual conflict of interest and adverse affect on the performance of counsel was present when counsel failed to call co-defendant Carchidi as a defense witness, even though his testimony would have refuted that of the state's star witness, in order to protect him from possible self-incrimination.

As I heretofore stated, the Magistrate faced the unenviable task of reconstructing facts which occurred well over a decade and a half ago. While rejecting much of Peruto's testimony[11], he found that "Peruto de-

---

**10.** Although the Magistrate referred to an exception to the hearsay rule, Fed.R.Evid. 803(3), instead of the non-hearsay use, the purpose of the evidence is apparent from his report. See Findings and Recommendation at 15. The evidence was admitted solely to prove the Commonwealth's knowledge and understanding of the case. Accordingly, the Magistrate did not err.

**11.** Had I heard the evidence I might not have been so generous in characterizing Peruto's testimony as merely a "post hoc rationalization of the trial decisions of counsel in order to remedy what he believes is an unjust conviction." To

cided not to use Carchidi's testimony because he perceived the possibility of harm to Carchidi's later defense and the incriminating potential of cross-examination".[12] Based on the trial transcript, the Magistrate concluded that Peruto perceived this danger before the close of the prosecution's case.[13] The Magistrate then points out that Peruto's 1974 testimony is consistent with his 1982 testimony with regard to considering the interests of the co-defendant in the decision to present no defense at petitioner's trial. Contrary to the respondent's suggestion, the Magistrate did not misread Peruto's 1974 testimony. Under direct examination by Mr. Moran, the following colloquy took place:

Q. Wait just a minute, sir. You were concerned with the other two defendants you represented; is that correct?

A. Yes. Why expose your defense if you've got two more people to come to trial and the Commonwealth has not presented a case?

Q. So that entered into your consideration as to whether or not you presented a defense in the *Sullivan* case?

A. Sure, it did. When we're talking about back and forth. For example, I've heard Judge DiBona testify today, and yes, we were sort of playing devil's advocate. I didn't want the defense to go on because I thought we would only be exposing *the defendant witnesses* for the other two trials that were coming up. Now on the other hand, you see, the three defendants had already decided between themselves which of us they wanted to be chief counsel. John Sullivan picked Fred DiBona, the other two defendants picked me. So certainly I had to be chief counsel and face the trial of the other two men. And as I look back on that, although it was not my thought that John Sullivan should be shortchanged in any fashion, I'm afraid that it was my thought, that I was over-solicitous for the other two defendants being ready to be tried.

P.C.H.A. at 101 (April 25, 1974) (emphasis added).

This testimony, while not in minute detail, clearly reflects counsel's concern for the defense of the untried defendants if they were to testify on behalf of the petitioner. This, of course, is consistent with the trial transcript and Peruto's more embellished testimony in 1982. Accordingly, I find that the respondent's objections to these credibility findings are without merit.[14]

■ In attacking the Magistrate's legal conclusion that an actual conflict of interest developed at trial which adversely affected the performance of counsel, the respondent

---

credit Peruto in toto would attribute to him an admission of serious unethical behavior. This testimony evokes the court's grave concern for the ability of members of the bar to recognize and fulfill their unequivocal duty to advise the court in a timely manner of any conflicts arising during the course of criminal proceeding.

**12.** Findings and Recommendation at 19.

**13.** Findings and Recommendation at 38.

**14.** Petitioner's argument that the Magistrate mistakenly believed that in 1974 Peruto testified that he intended to call Carchidi as a witness is misplaced. The Magistrate never indicated this in his findings, nor would he, since he concluded that the interest of the co-defendant and minimal evidence presented by the prosecution were interwoven in the decision not to present a defense. Peruto, therefore, never intended to call Carchidi as a witness because of this conflict of interest. The assertion that the Magistrate misread the part of the 1974 record discussed above is both moot and factually incorrect. Also, the petitioner's argument that the Magistrate made contradictory findings regarding Peruto's behavior during trial is laced with text taken out of context. The citation to *United States v. Provenzano*, 688 F.2d 194, 199 (3rd Cir.1982) suggests that counsel did not comment to the *jury* on their inability to call Carchidi as a witness.

With regard to Carchidi's desire to testify, the Magistrate's credibility finding cannot be disturbed. Surely, Carchidi would have heeded any advice his counsel proffered. And, again, respondent's misquote of the Magistrate's memorandum fails to reinforce its objection to this credibility determination or his legal conclusion. See Memorandum in Support of Objection at 8.

asserts that even if a conflict existed no adverse effect can be shown because "counsel [were] no less effective than any other lawyer would have been." Memorandum in support of Commonwealth's Objections at 10. Simply stated, the respondent suggests that no competent lawyer would have allowed Carchidi to testify for the petitioner; thus, logic dictates that both counsels' performance and the outcome of the trial were not affected by any alleged conflict. Although facially appealing, I agree with the conclusion of the Magistrate that this argument misperceives the nature of conflict of interest generated ineffective assistance of counsel.

In his report, the Magistrate ably traced the evolution of the standard enunciated in *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980) and the division opinion which its ambiguous language has spawned in the courts of appeals. He reasoned that the Court requires a finding of actual conflict which causes the attorney to choose a course of action adverse to his client's interests without the necessity of showing that the lapse in representation affected the outcome of the trial. Thus, because he found that counsel labored under conflicting duties (i.e.—to present exculpatory evidence on petitioner's behalf through the testimony of the co-defendant, yet to protect the co-defendant from possible self-incrimination), and that counsel chose the latter course of action adverse to petitioner's best interest, he concluded that the attorney's performance was adversely affected within the meaning of *Sullivan.* He declined to accept respondent's argument advanced herein since it is "merely an attempt to redefine the *Sullivan* standard in terms of prejudice." Findings and Recommendation at 45. I fully concur with this analysis and adopt it herein. Accordingly, my discussion will be confined to the fundamental flaw in the respondent's reasoning.

The semantic ambiguities in the various opinions dealing with conflicts of interest both pre and post *Sullivan* create the opportunity for courts to utilize catch-word phrases in analyzing difficult factual patterns. But conclusory terms such as "prejudice" and "adverse effect" on counsel's performance, while efficient, are not always analytically sound. Although referring to these terms of art, the Court in *Sullivan* itself suggested the precise mode of analysis that the Magistrate utilized. After identifying the relevant standard and explaining it by distinguishing *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942) and *Dukes v. Warden,* 406 U.S. 250, 92 S.Ct. 1551, 32 L.Ed.2d 45 (1972), the Court concluded:

> Thus, a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief. See *Holloway [v. Arkansas,]* supra, [435 U.S. 475] at 487–491 [98 S.Ct. 1173, 1180–82, 55 L.Ed.2d 426]. But until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance. See *Glasser,* supra, [315 U.S.] at 72–75 [62 S.Ct. at 465–67].[15]

15 See Comment, Conflict of Interests in Multiple Representation of Criminal Co-Defendants. 68 J.Crim.L. & C. 226, 231–232 (1977).

*Cuyler v. Sullivan,* supra, 446 U.S. at 349–50, 100 S.Ct. at 1718–19. The Court's citation to the article in footnote fifteen signifies its intended explication of the phrase—"counsel actively representing conflicting interests." Perusal of the article at the cited pages uncovers essentially the same analysis contemplated by the majority of decisions subsequent to *Sullivan,* and employed by the Magistrate herein.[15]

■ The danger in Sixth Amendment terms to be identified by the *Sullivan* analysis is the causative effect on the lawyer's

15. The Article theorizes that:

A careful reading of *Glasser* suggests that conflict of interest cases require analysis in three steps. First, some divergence must be described in the positions of the defendants. In *Glasser,* Kretske was more directly implicated in the conspiracy than was Glasser. Stewart, the attorney, was very reluctant to associate them in the eyes of the jury. Second, it must be shown that the attorney made a choice between possible alternative courses of action, such as eliciting (or failing

judgment of the conflicting interests. When the division in loyalty directly affects the lawyer's judgment, representation is *per se* ineffective and counsel is in essence denied altogether. This is because the "right to counsel guaranteed by the Sixth and Fourteenth Amendments contemplates the service of an attorney devoted solely to the interests of his client". *United States ex rel. Hart v. Davenport,* 478 F.2d 203, 209 (3rd Cir.1973). Thus, it is the impaired loyalty itself; not the degree of incompetence produced by the impairment which violates the spirit of the Sixth Amendment. This view is evinced by the distinction drawn between conflict ineffectiveness and incompetence ineffectiveness.[16]

■ The circumstances of this case, as discussed by the Magistrate, demonstrate an actual conflict of interest which caused the attorneys to consider the co-defendant's interest in their decision to rest the petitioner's defense. The divergence in loyalties either to proffer the co-defendant as a rebuttal witness, or withhold his testimony to protect him from the perils to self-incrimination produced the requisite adverse effect on the representation by forcing

counsel to compromise their decision in favor of the co-defendant. Thus, in this instance, the concept of "conflict" and "adverse effect" merge. The nature of this particular conflict by definition affected petitioner's representation. The choice mandated by the inconsistent obligations is constitutionally impermissible. To indulge in a calculation as to the effect on the outcome of the trial caused by this "impermissible choice", is limitless and futile. The Sixth Amendment is worthy of more than this meaningless gesture.

Moreover, the cases cited in detail by the Magistrate support this conclusion. See *United States v. Levy,* 577 F.2d 200, 241 (3rd Cir.1978); *United States v. Dolan,* 570 F.2d 1177, 1179 n. 2 (3d Cir.1978).[17] See also, *United States v. Pinc,* 452 F.2d 507, 509 (5th Cir.1971) (inability to call jointly represented co-defendant as defense witness with exculpatory testimony—"prejudicial").[18] But see *Davidson v. Cupp,* 446 F.2d 642 (9th Cir.1971).[19]

For these reasons as well as those so ably stated by the learned Magistrate, I hold that the petitioner was deprived of effective assistance of counsel in violation of the

---

to elicit) evidence helpful to one client but harmful to the other. If he did not make such a choice, the conflict remained hypothetical. If he did, the conflict materialized, and it is at least theoretically possible to determine which client was protected by the action chosen, and which was prejudiced in the sense of sacrificing his best defense. It is only the latter who is in fact denied the effective assistance of counsel. Third, the harmless error rule is not applied, because any choice mandated by inconsistent obligations and surrendering a possible means of defense is impermissible. The error cannot be weighed to determine whether it was harmless in the circumstances. For example, the Court in *Glasser* specifically declined to inquire whether evidence to which an objection might have been offered would have been admissible over objection.
Comment, supra, 68 J.Crim.L. and C. at 231–232 (footnotes omitted).

16. Incompetence ineffectiveness claims ordinarily require some showing of prejudice. See *Washington v. Strickland,* 673 F.2d 879, 900–02 n. 25 (D.C.Cir.1982); *United States v. Baynes,* 687 F.2d 659, 669–70 (3d Cir.1982). Conflict ineffectiveness, on the other hand, results from the denial of loyal counsel. As stated in *Smith v. Anderson,* 689 F.2d 59 (6th Cir.1982):

The rule that harmless error has no application to ineffective assistance claims due to conflict in counsel's interests follows from the elemental observation that attorneys burdened with conflicting considerations are forced to refrain from singleminded pursuit of a single defendant's claims. The harm proceeds not so much from what counsel did in light of the conflict but rather from what counsel did not do. This differs from the normal case where "the error occurs at trial and its scope is readily identifiable." *Holloway,* 435 U.S. at 490 [98 S.Ct. at 1182]. Id. at 65. See also, *United States ex rel. William V. Frazen,* 687 F.2d 944, 945–50 (7th Cir. 1982).

17. The court of appeals identified *Dolan,* supra, as a case of an "actual serious conflict of interest." *United States v. Flanagan,* 679 F.2d 1072, 1076 (3rd Cir.1982). See also, *United States v. Laura,* 607 F.2d 52, 60 n. 6 (3rd Cir.1979).

18. Cited with approval in *United States v. Johnson.* 569 F.2d 269, 271 (5th Cir.1978).

19. The court in *Davidson,* stated that there was nothing in the record to indicate that the co-defendant's testimony would have been helpful.

Sixth and Fourteenth Amendments of the United States Constitution. I have not made this decision lightly. But my sworn duty to "safeguard the liberty of all persons ... against infringement through any violation of the Constitution" compels this conclusion. *Townsend v. Sain,* 372 U.S. 293, 311, 83 S.Ct. 745, 756, 9 L.Ed.2d 770 (1963) (quoting *Hawk v. Olson,* 326 U.S. 271, 274, 66 S.Ct. 116, 118, 90 L.Ed. 61 (1945)). Petitioner's conviction cannot stand and the writ must issue.

### ORDER

AND NOW THIS 16th day of December, 1982, IT IS HEREBY ORDERED THAT:

1. The Findings and Recommendation of the United States Magistrate is approved and adopted.

2. The petition for writ of habeas corpus is Granted, the execution of the writ is stayed for a period of sixty (60) days from the date of the Order of the Court to allow the Commonwealth of Pennsylvania an opportunity to appeal as provided by law or to relist the Bill of Indictment for a speedy trial.

### FINDINGS AND RECOMMENDATION

October 18, 1982.

EDWIN E. NAYTHONS, United States Magistrate.

### I

### INTRODUCTION

This case has run the legal gamut. It has traversed the continuum of legal process available to an individual who is confronted by the prosecutorial power of the state. It has spawned no less than eight separate opinions by various courts; state and federal. Whatever issue the parties take with this court's disposition of the merits of this habeas corpus petition, it cannot be said that they did not receive the process they were due.

The procedural history of this case has been exhaustively set forth in prior opinions by the Supreme Court,[1] twice by the Circuit Court of Appeals,[2] and the Pennsylvania Supreme Court[3] as well as this court.[4] Nevertheless, it is necessary to briefly summarize the procedural posture in order to understand the precise issues which the court decides herein.

### II

### PROCEDURAL HISTORY

On June 19, 1967, after a two week jury trial, the petitioner, John Sullivan, was convicted of two counts of first-degree murder.[5] Punishment was fixed at two consecutive life-sentences for the killings. Gregory Carchidi and Anthony DiPasquale were also indicted along with the petitioner but were acquitted in subsequent trials on January 26, 1968, and March 14, 1968, respectively. Both were represented at trial by the same counsel which represented Sullivan—G. Fred DiBona and A. Charles Peruto. Following the denial of motions for a new trial and in arrest of judgment by a

Thus, this case can be viewed as a failure of proof of an actual conflict, or alternatively as one requiring a showing of prejudice contrary to the import of *Sullivan.* See *United States v. Decoster,* 624 F.2d 196, 225 n. 6 (D.C.Cir.1976). Furthermore, the Magistrate artfully described why the cases cited by the respondent are inapposite.

1. *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980).

2. *United States ex rel. Sullivan v. Cuyler,* 631 F.2d 14, 15 (3rd Cir.1980); *United States ex rel. Sullivan v. Cuyler,* 593 F.2d 512 (3d Cir.1979), rev'd, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980).

3. *Commonwealth v. Sullivan,* 472 Pa. 129, 371 A.2d 468 (1977); *Commonwealth v. Sullivan,* 446 Pa. 419, 286 A.2d 898 (1971).

4. *United States ex rel. Sullivan v. Cuyler,* 530 F.Supp. 1353 (E.D.Pa.1982); *Sullivan v. Cuyler,* No. 77–2527 (February 2, 1978) (Davis, S.J., rejecting the Recommendation of the United States Magistrate herein filed November 1, 1977).

5. *Commonwealth of Pennsylvania v. John Sullivan,* Court of Common Pleas, Trial Division, Criminal Section, Philadelphia County, November Session 1966, Numbers 190–93.

three judge panel of the Courts of Common Pleas, judgment of sentence was imposed as the jury directed. On November 29, 1971, an equally divided court affirmed the conviction on direct appeal. *Commonwealth v. Sullivan*, 446 Pa. 419, 286 A.2d 898 (1971). Petitioner twice sought reconsideration of this decision after new counsel was obtained. Both applications were denied.[6]

The petitioner then sought collateral relief under the Pennsylvania Post Conviction Hearing Act ("P.C.H.A.").[7] Upon consideration of the petition, the P.C.H.A. court held that the petitioner could take a second direct appeal because counsel had not adequately assisted him in his first appeal.[8] After consolidation of this appeal and various cross appeals, the Pennsylvania Supreme Court, once again, affirmed petitioner's original conviction and the denial of collateral relief. *Commonwealth v. Sullivan*, 472 Pa. 129, 371 A.2d 468 (1977).[9]

Having exhausted his state remedies,[10] the instant petition for habeas corpus relief was filed on behalf of the petitioner. Seven separate grounds for relief were alleged:

(1) The admission into evidence of color slides was a denial of due process;

(2) that the factual data underlying relator's conviction was so totally void of evidentiary support as to violate due process;

(3) defense counsel had a conflict of interest because he also represented two other persons charged with the same crime;

(4) counsel was ineffective by failing to object to certain testimony;

(5) counsel was ineffective in failing to reserve objections to the offering of a secret memorandum to the trial judge;

(6) the trial judge erred in instructing the jury on degree of guilt, amounting to a denial of due process;

(7) the failure of the prosecution to disclose certain evidence denied him due process of law.

The petition was referred to this United States Magistrate. I found all grounds without merit except the Sixth Amendment claim based upon conflict of interest. I concluded that petitioner's trial counsel also represented the untried co-defendants and the record disclosed at least a possibility of conflict of interests in the dual representation.

Thereupon, the District Court rejected the recommendation only insofar as it found merit to conflicts of interest ques-

---

**6.** See *Commonwealth v. Sullivan*, 472 Pa. 129, 180, 371 A.2d 468, 492 (1977) (Pomeroy, J., concurring and dissenting). Contemporaneously, petitioner's *pro se* petitions for federal habeas corpus relief were dismissed for failure to exhaust state remedies. *United States ex rel. Sullivan v. Rundle*, No. 69–244 (E.D.Pa. June 12, 1969) and *United States ex rel. Sullivan v. Rundle*, No. 69–452 (E.D.Pa. September 12, 1969), certificate of probable cause denied, Misc. No. 1377 (3d Cir. December 31, 1969), were dismissed because petitioner's direct appeal was pending. *United States ex rel. Sullivan v. Johnson*, No. 73–1094 (E.D.Pa. September 11, 1973) was dismissed for failure to exhaust state remedies.

**7.** 19 Pa.Con.Stat.Ann. § 1180–1–14 (West Supp.1982). The grounds set forth for relief were: (1) ineffective assistance of counsel; (2) denial of right to appeal; (3) that the trial court erred in instructing the jury; (4) indictments were based on perjured testimony; (5) improper introduction of a statement of an alleged co-conspirator; (6) the conviction was based on insufficient evidence; (7) an inculpatory statement was illegally introduced; (8) admis-

sion of prejudicial testimony regarding relator's request for an attorney; (9) the improper display of inflammatory pictures; (10) the judge's receipt of secret evidence from the District Attorney.

**8.** The court also rejected many of the other grounds for relief asserted but did not decide squarely the Sixth Amendment claim of conflict of interest. *United States ex rel. Sullivan v. Cuyler, supra,* 530 F.Supp. at 1358.

**9.** In assessing the Sixth Amendment claim of conflict of interest the court concluded that there was "no dual representation in the true sense of the term." *Id.* 472 Pa. at 161, 371 A.2d at 483. Based upon the recollection of Sullivan's chief counsel, DiBona, that he saw no conflict, the court found no evidence of conflict of interest in the record. *Id.*

**10.** This fact is conceded in the prior proceedings before the Court of Appeals. *United States ex rel. Sullivan v. Cuyler, supra,* 593 F.2d 515 n. 5.

tion. The court adopted the position of the Pennsylvania Supreme Court that there had been no dual representation.[11] The District Court also seemed to indicate that, assuming that dual representation existed, no conflict of interest was borne out by the record in the P.C.H.A. proceeding.

On appeal, addressing only the conflict of interest issue, the Court of Appeals held that there was sufficient involvement by both attorneys in the case of all co-defendants to constitute multiple representation as a matter of law. *United States ex rel. Sullivan v. Cuyler, supra,* 593 F.2d at 519. Furthermore, the court found that on the record before it there was at least a possibility of a conflict of interest, which, they held, was sufficient to constitute a violation of petitioner's Sixth Amendment right to effective assistance of counsel. *Id.* at 524. Accordingly, the court directed the District Court to grant the writ.[12]

The Supreme Court granted *certiorari,* 444 U.S. 823, 100 S.Ct. 44, 62 L.Ed.2d 30 (1979) and vacated the order of the Court of Appeals. In *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), the Court agreed that there was, in fact, dual representation, but held that a showing of a potential conflict of interest was insufficient to taint a criminal conviction under the Sixth Amendment. *Id.* at 348, 100 S.Ct. at 1718. The court developed a new standard which requires that a defendant "must establish that an actual conflict of interest adversely affected his lawyer's performance . . ." before a violation of the Sixth Amendment can be found. *Id.* The Supreme Court remanded to the Court of Appeals to apply the proper legal standard.

The Court of Appeals, in turn, remanded to the District Court, so that the case could be "considered in light of the Supreme Court's decision in both *Cuyler v. Sullivan*

(as to actual conflict) and *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (as to sufficiency of evidence)." *United States ex rel. Cuyler v. Sullivan, supra,* 631 F.2d at 16. It must be noted that the Court of Appeals directed the District Court to first consider the sufficiency of the evidence under the new standard formulated in *Jackson, supra,* and "[I]f the District Court concludes that the evidence is insufficient . . ., the writ should issue and the court need not further address the remaining grounds in the petition." *Id.* Furthermore, if the conflict of interest issue must be reached, the District Court should "reexamine its finding of no actual conflict with the certainty of knowledge of the existence of 'dual representation' and with the benefit of the Supreme Court's pronouncements in *Cuyler v. Sullivan." Id.* at 17. (Citations omitted).

Upon remand to the District Court, the court found in order to address the merits it was necessary to reconsider its prior order of March 17, 1981,[13] *sua sponte,* because it found the state court record critically deficient in that:

(1) no relevant fact-finding took place in the P.C.H.A. hearing since that court did not decide the constitutional claim on the merits; and (2) the merits of the factual dispute at issue herein were not resolved since the erroneous legal conclusion of the state appellate court that no multiple representation occurred precluded the possibility of relevant fact-finding on the constitutional issues presented on remand to this court.

*United States ex rel. Sullivan v. Cuyler, supra,* 530 F.Supp. at 1361. Pursuant to the order of the district court, this United States Magistrate conducted five days of evidentiary hearings limited to the issue of

---

**11.** See *supra,* at n. 9.

**12.** Judge Garth, with whom Judge Adams and Roseman joined, filed an opinion dissenting from the denial of a petition for rehearing *en banc. Id.* at 524. Judge Garth disagreed with the standard for relief utilized by the panel and would have required a showing of actual preju-

dice at trial before a writ should issue in cases claiming a conflict of interest based on dual representation. *Id.* at 525.

**13.** This order granted respondent's motion to proceed with the petition for habeas corpus solely upon the state court record.

conflict of interest.[14] After a thorough review of the evidence and the briefs submitted by the parties, this memorandum embodies my Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52(a) on the two issues to be determined on remand to the district court as directed by the Court of Appeals in *United States ex rel. Sullivan v. Cuyler, supra,* 631 F.2d at 16–17.

### III

### FACTUAL BACKGROUND

### ARREST AND CONVICTION OF THE PETITIONER

On the morning of June 18, 1966, the bodies of John Gorey, a labor union official, and Rita Janda, his girlfriend, were discovered in Gorey's second floor office at the Philadelphia headquarters of Teamsters' Local 107. Both victims were repeatedly shot in an assassination-type slaying on the previous evening. The Philadelphia Police along with the District Attorney's Office initiated an intensive investigation to find the killers.

Initially, their investigation was stymied. Fear permeated throughout the union membership. Most potential witnesses in the union rank and file did not cooperate with the police or declined to give statements on the advice of union attorneys. Even the Secretary Treasurer of the union, Michael Hession, indicated to the investigating district attorney, Richard Sprague, that he was frightened for his life.

One such witness who exemplifies this stonewalling practice is Gregory Carchidi, a union janitor, who was sought by police because he was allegedly in the building at the time the shots were fired. On June 21, 1966, detectives went to Carchidi's home in Belmar, New Jersey to talk to the witness. Upon inquiring at the door, the detectives found Carchidi on the phone with a union attorney who stated to the detectives that his client would not answer any questions or return to Philadelphia. Carchidi then promptly told the detectives to "get the fuck out of his house." (Tr. at 33, June 1, 1982).

After a period of time, Sprague contacted union attorneys. The so-called "conspiracy of silence" broke down somewhat. Statements were obtained from a myriad of witnesses; some of whom were inside the union hall or waiting in the parking lot for a union meeting to begin on the evening of the murders.

After some four months of investigation the Commonwealth theorized that Gorey, the union's business agent and a member of a reform faction of the union, was murdered because he was about to expose fraud in the union's Health and Welfare Fund. Ultimately, investigation focused on Carchidi, John Sullivan and Anthony DiPasquale; all union employees. All three men were placed in the building under suspicious circumstances at the time of the murders by Francis McGrath, another union janitor. Moreover, the Commonwealth believed that Sullivan had underworld connections and was using his position as the local's health and welfare collector to run a lottery.[15] Finally, on November 3, 1966, some four and one-half months after the killings, a Medical Examiner's Inquest was held under applicable Pennsylvania procedure. Sullivan, although subpoenaed, declined to testify upon advice of his counsel, John Walsh. Carchidi also declined to testify upon advice of his own counsel, Robert Gabriel. Nevertheless, Sullivan, together with Carchidi and Anthony DiPasquale were held without bail for the grand jury. Subsequently, all three were indicted by the grand jury for murder and conspiracy and held without bail. In January, 1967, at the request of

---

**14.** Because of the unavailability of key witnesses, the hearing was staggered to accommodate the parties. Hearings were held on May 3, 1982, May 12, 1982, May 13, 1982, June 1, 1982, and June 21, 1982. The entire state court record was also made a part of the record in this habeas corpus case.

**15.** I need not speculate as to the veracity of this postulation since the evidence was admitted pursuant to Federal Rules of Evidence 803(3), and is relevant to show the prosecution's theory which may in turn impact the tactical decisions by the defense.

Carchidi's family, A. Charles Peruto, Esquire visited with Carchidi and DiPasquale while they were incarcerated in Holmesburg Prison. At that time, Peruto was retained to represent both defendants. Thereafter, in February of 1967, both Peruto and his partner, G. Fred DiBona, met with Carchidi and DiPasquale in the seventh floor holding cell at City Hall. At some point Carchidi asked Peruto and DiBona to represent Sullivan also. The attorneys agreed and thereafter represented all three defendants jointly.[16]

Carchidi and DiPasquale made the fee arrangements since Sullivan had insufficient funds to retain the attorneys on his own. Sullivan did not contribute to the fees paid the attorneys. Sullivan, however, was informed generally about the possibility of a conflict of interest arising from the multiple representation in this case.[17]

The defendants were to be tried separately under then existing Pennsylvania procedure. Sullivan chose DiBona as lead counsel while Carchidi and DiPasquale chose Peruto. But both attorneys jointly planned the trial strategy of the cases. Shortly before the beginning of Sullivan's trial on June 7, 1967, counsel learned that he would be tried first.

As described by the Court of Appeals, the evidence proffered at petitioner's trial was "entirely circumstantial." *United States ex rel. Sullivan v. Cuyler, supra,* 593 F.2d at 516. The Pennsylvania Supreme Court's summarization, in the light most favorable to the Commonwealth, was adopted by that court. *Id.* at 516–17.[18] It reads as follows:

The chief prosecution witness, one Francis McGrath, was employed as a janitor at the union hall where the bodies were eventually discovered. On July 17, 1966, he arrived at work approximately 6:00 P.M. and parked his automobile in the lot adjacent to the building. At that time,

he specifically observed two other vehicles on the premises. One was owned by appellant and the other was being used at the time by one Anthony DiPasquale. After alighting from his car, McGrath noticed appellant looking out onto the parking lot from the window of a second floor office normally used by other union officials. The witness then entered the building and proceeded to the second floor to commence his duties. Appellant was still seated by the window when McGrath entered that office. Sullivan inquired about the janitor's presence and instructed McGrath to wait until Sunday night to clean, since a union meeting was scheduled for that date and the building would require cleaning after the gathering. McGrath ignored the suggestion and continued collecting the trash from the offices. The witness then took the refuse outside the building. When he returned, appellant was still seated at the window.

At this time, both Sullivan and McGrath observed John Gorey and Rita Janda arrive at the union hall in Gorey's car and enter the building. McGrath then began cleaning the conference room, located approximately 75 feet from Gorey's office. Shortly thereafter, Gorey appeared and had a brief conversation with McGrath. Immediately after Gorey left the conference room, appellant appeared in the doorway, through which Gorey had just passed, and again questioned McGrath about the cleaning and suggested he defer his activities until Sunday afternoon. During this brief conversation, Gregory Carchidi, another janitor, entered the conference room. No conversation ensued between Carchidi and Sullivan but Carchidi repeated appellant's urgings to leave the work until Sunday. Sullivan then left the room through the same door which Gorey had exited but Carchidi re-

---

16. It is now beyond dispute that both Peruto and DiBona represented all three co-defendants jointly. *Cuyler v. Sullivan, supra,* 446 U.S. at 342, 100 S.Ct. at 1714 -15.

17. There is, however, no argument that Sullivan waived his right to assert this claim nor

could there be. See gen., *United States v. Flanagan,* 679 F.2d 1072 (3d Cir.1982).

18. I also adopted this statement of the evidence as accurate in my prior report. See Report and Recommendation at 4–10 (November 1, 1977).

mained and seated himself behind the desk.

Within several minutes, the witness testified he heard sounds like firecrackers going off in rapid succession. McGrath started to question Carchidi about the disturbance but was abruptly instructed to "Get out of the building and don't say nothing" (sic). McGrath left the union hall and noticed four cars other than his own parked in the lot. These were recognized as belonging to DiPasquale, Gorey, Carchidi and appellant. McGrath drove off but returned to the premises within 15 minutes. Only Gorey's car remained in the lot. Upon re-entering the building, he found the offices closed, the conference room locked and the lights out. The victims' bodies were discovered the following morning. Gorey had been shot four times and Janda six times, the shots being fired from close range. The ballistics studies established two separate guns were employed in the homicides but the weapons were never recovered.

Additional testimony disclosed that the telephone lines had been arranged so that regular incoming calls would ring in the room in which appellant was seated. A second line with a different call number had been prearranged by Gorey to ring in his office so that he could receive an anticipated call from Joseph Vernick at 7:00 P.M. One Irene Glenn testified for the Commonwealth that she dialed the regular union phone number about 6:15 P.M. that evening and a man answered identifying himself as Gorey. A scrap paper found in the wastebasket alongside the desk where appellant had been seated prior to the victim's arrival contained Ms. Glenn's name and telephone number. It was uncontested that the handwriting was that of appellant. Moreover, one Joseph Vernick testified that he called Gorey's office at a specially arranged time but received no answer despite his repeated attempts between 7:15 and 8:15 P.M. This evidence, coupled with the medical examiner's testimony, indicated that the time of death could have been approximately 7:15 P.M.

*Commonwealth v. Sullivan, supra,* 472 at 147–49, 371 A.2d at 477.

Upon completion of the Commonwealth's case the defense rested without presenting any evidence. Petitioner, it must be emphasized, did not testify.

The defense of the petitioner was plotted by his attorneys in concert. Both attorneys were experienced trial lawyers and were "at the top of the criminal bar in Philadelphia." (Tr. at 22–23, June 1, 1982). The preparation of the defense began after counsel were retained in January of 1967. Before Sullivan's trial was held, the attorneys held several meetings with all defendants jointly at which time the defendants were interviewed concerning their potential testimony; potential defenses were discussed as well as potential defense witnesses. During these early discussions, it was determined that the best defense was for all three defendants to deny involvement in the crimes since all professed their innocence. The defense would be united and of maximum benefit to all three defendants. When the petitioner was brought to trial first, these discussions of defense strategy continued amongst counsel and all three defendants on a daily basis. These discussions during the course of the trial routinely occurred in the *seventh floor cell room* prior to trial, during recesses and at the end of the day's testimony.

The decision not to put on a defense was arrived at jointly by Sullivan and both counsel after lengthy discussion prior to and after the close of the Commonwealth's case. The co-defendants also participated in the discussion concerning their potential roles in the defense but did not have any input into the ultimate decision. All facets of the potential defense strategy were discussed prior to counsel's decision to rest which the petitioner ultimately concurred in.

In discussing potential defense witnesses, counsel agreed that any of the so-called witnesses outside of the building at the time of the shooting would not aid the

defense.[19] Counsel did not save the witnesses for the defense of the remaining defendants because their testimony would not have been exculpatory in any manner. Furthermore, Peruto did not preclude the witnesses from testifying in order to preserve his so-called "false alibi" defense for the Carchidi case.[20] Simply put, the witnesses were of no value to the defense.

On the other hand, the value of Michael Hession as a witness was considered by counsel.[21] Hession presumably would have impeached the star witness, McGrath, and would have corroborated the petitioner's reasons for his presence in the building on that night; thus, refuting the Commonwealth's suggestion that Sullivan's presence in the building, and particularly in the second floor office, was suspicious. The petitioner urged counsel to present Hession as a witness. After considering the value of this testimony, counsel decided that because Hession was frightened for his life his testimony would be of little value. P.C.H.A. at 20–21 (April 24, 1974). Questioning Hession's reliability, the attorneys decided that for tactical reasons Hession should not testify. P.C.H.A. at 99–100 (April 24, 1974). As the trial developed, counsel utilized this tactical decision to their benefit by cross-examining the star-witness McGrath about his prior inconsistent statements to Hession. Trial Transcript of June 14, 1967 at 747–754. This tactical decision was not affected by the consideration of the possible benefit of Hession's testimony at the trial of the co-defendants.

Another possible defense witness was co-defendant Carchidi. All of the defendants and the attorneys discussed the possible roles to be played in each others defense. Counsel felt essentially that the only real inculpatory evidence against the petitioner was the testimony of McGrath. Tr. at 20 (May 13, 1982); P.C.H.A. at 108 (April 24, 1974). Had Carchidi testified, the essence of his testimony would have refuted much of McGrath's testimony. Specifically, Carchidi stated that he approached McGrath in the conference room on the night of the killings and told him that Hession wanted to talk to him about his absence from work. He would have denied telling McGrath to put off his cleaning until later. He also would have denied telling McGrath to get out of the building and say nothing immediately after the shots were fired. Tr. at 31 (May 13, 1982); P.C.H.A. at 85 (August 8, 1974). In addition to refuting McGrath's version of the incident, Carchidi would have testified about Sullivan's normal working habits and his inconspicuous use of the second floor office. Carchidi was willing to be a witness in the Sullivan trial if counsel so desired but was wary of the prospect of incriminating himself. Peruto decided not to use Carchidi's testimony because he perceived the possibility of harm to Carchidi's later defense and the incriminating potential of cross-examination. Tr. at 21 (May 12, 1982). DiBona felt the testimony was not necessary because he was convinced that the jury would return a verdict of not guilty so he concurred in Peruto's position. P.C.H.A. at 18, 19, 80, 83 (April 24, 1974). The decision of counsel not to call Carchidi

---

**19.** With this finding, I obviously reject Peruto's testimony that such witnesses would have testified that Sullivan left the union hall prior to the shootings as completely incredible. Peruto's testimony on this point is internally inconsistent and at odds with his prior testimony as well as DiBona's. Compare Tr. at 9–10 with 13–14, (May 3, 1982), 4-5 and 46 (May 12, 1982) with P.C.H.A. at 107 (April 25, 1974). Moreover, it is simply not borne out by any of the statements these witnesses gave to the police. See Opinion of Davis, S.J., at 1 (February 18, 1982). I credit DiBona's version as relayed at the P.C.H.A. proceeding. P.C.H.A. at 6–9 (April 24, 1974).

**20.** This court understands Peruto's suggestion that he intended to lull the prosecution into a false sense of security by conveying the impression that he would profer an alibi defense at Carchidi's trial when in fact he did not intend to do so. The Court rejects this testimony regarding this somewhat ingenious defense ploy as merely an afterthought to substantiate the allegation of conflict of interest. Peruto surely would have recalled plotting this tactic during his P.C.H.A. testimony in 1974, yet the record shows that such testimony is conspicuously absent.

**21.** Hession is now deceased.

was contemplated before the close of the Commonwealth's case. Trial at 671 (June 13, 1967). Upon advice of his counsel, therefore, Carchidi did not take the stand in Sullivan's defense. Tr. at 18 (May 12, 1982).

The final possible witness for the defense was, of course, Sullivan himself. Initially, the petitioner wished to take the stand to deny his involvement in the killings and explain his presence at the union hall. DiBona concurred in this view at first. Peruto, however, advocated resting at the close of the Commonwealth's case. Several hours of discussion took place on the subject between all the principals involved in the City Hall holding cell after the Commonwealth rested.

Peruto's position was based upon his natural concern that if Sullivan testified, cross-examination would prove destructive to a case which he already believed he had won. Several factors influenced his advice. First, it is conceded that Sullivan was involved in a meritricious relationship with a woman by whom he had fathered two children. While this fact alone did not concern Sullivan, it was a cause of substantial concern for Peruto. Tr. at 49 (May 12, 1982); P.C.H.A. at 102, 122 (April 25, 1974). Furthermore, the attorneys were aware of the petitioner's prior criminal record as a source of impeachment.[22] This was particularly a cause for concern because both attorneys were aware that there was speculation that Sullivan was using the union hall to place

sports bets. Any risk to the defense here was to be avoided.

After substantial discussion of the disadvantages of putting Sullivan on the stand, DiBona acceded to Peruto's position because he opined that the prosecution's case was sheer speculation and that an acquittal would result.[23] Tr. at 68 (June 21, 1982); P.C.H.A. at 18–20 (April 24, 1974). Peruto concurred in this view. Tr. at 24 (May 3, 1982). Both attorneys advised Sullivan not to take the stand, and after consultation with his family, Sullivan heeded the advice of his attorneys and did not testify.

Implicit in the foregoing recital of the facts is the finding that much of Peruto's testimony is simply a post hoc rationalization of the trial decisions of counsel in order to remedy what he believes is an unjust conviction. If Peruto is credited *in toto,* then virtually every trial decision was laden with conflict of interest and designed in fact to benefit the co-defendants. I chose not to ascribe such unethical behavior to counsel and dismiss most of his testimony as simply not credible.[24]

With this factual background, I now turn to the issues remanded for consideration by the Court of Appeals, namely: (1) the sufficiency of the evidence, and (2) conflict of interest.

## IV

### SUFFICIENCY OF EVIDENCE

Subsequent to my initial decision in this case, the Supreme Court formulated a new

---

**22.** Whether or not these prior convictions were legally admissible is irrelevant, since I find that the attorneys were aware of the criminal history of the petitioner and this history influenced the attorneys' trial strategy. It is simply beyond belief, as suggested by the petitioner, that the attorneys for the defense were totally unaware of this potential for cross-examination since the petitioner's record was well known to the police and the union membership.

**23.** I find that at no time did Judge Barbieri, the trial judge, state that he would grant a judgment of acquittal if the jury returned a guilty verdict. I find, however, that he did opine that in the presence of all attorneys that the prosecution had put on a weak case.

**24.** Contrary to Peruto's suggestion that the posture of the law in 1966 would not have

warranted disciplinary action had the conflict testified to had been actually present, the prohibitions against representing clients with conflicting interests have been embedded in the Cannons of Ethics since 1937. See Cannon 6—Adverse Influences and Conflicting Interests. That Cannon was adopted by the Pennsylvania Bar Association on January 7, 1938. See A.B.A., Code of Professional Responsibility p. 5–101 n. 19 (1974 Ed.) (adopted in Pennsylvania May 20, 1920). Moreover, the seminal Supreme Court case dealing with conflicts of interest was decided on January 19, 1942, *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). See also, *United States ex rel. Miller v. Myers,* 253 F.Supp. 55 (E.D.Pa. 1966).

standard for reviewing sufficiency of the evidence in a habeas corpus proceeding. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Because of the intervening decision in *Jackson* and the Pennsylvania Supreme Court's even division twice on this issue,[25] the Court of Appeals directed that the district court review the evidence supporting the conviction in the first instance. My task, therefore, is to apply new standard created in *Jackson* to the facts upon which the conviction is based as previously recited.

As the Court of Appeals has recently stated, "[I]n reviewing the sufficiency of the evidence underlying a criminal conviction, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Paulett v. Howard,* 634 F.2d 117, 118 (3d Cir.1980) (quoting *Jackson v. Virginia, supra,* 443 U.S. at 319, 99 S.Ct. at 2789) (emphasis in original). I conclude, after another independent review of the trial record, that a rational trier of fact could have found petitioner guilty of the crimes beyond a reasonable doubt.

The only issue at trial was the identity of the killers. Petitioner denied any involvement. The evidence against petitioner consisted entirely of inferences of a conspiracy because of the actions of the petitioner and the co-defendant, Carchidi.[26] It was for the jury to draw all reasonable inferences from these basic facts to the ultimate fact—i.e. that the petitioner participated in the conspiracy. *Jackson v. Virginia, supra,* 443 U.S. at 319, 99 S.Ct. at 2789. To find in

favor of the petitioner would merely substitute my judgment for that of the jury as to what inferences should be drawn from the evidence. Considering all the evidence in the light most favorable to the prosecution, I cannot say that no rational trier of fact could have found the essential elements here established beyond a reasonable doubt.

V

SIXTH AMENDMENT—CONFLICT OF INTEREST

The assistance of counsel in criminal cases, as guaranteed by the Sixth Amendment has been recognized by the Supreme Court as a fundamental right. The importance of this right is echoed in the words of Mr. Justice Murphy:

The guarantees of the Bill of Rights are the protecting bulwarks against the reach of arbitrary power. Among those guarantees is the right granted by the Sixth Amendment to an accused in a criminal proceeding in a federal court "to have the assistance of counsel for his defense." "This is one of the safeguards deemed necessary to insure fundamental human rights of life and liberty," and a federal court cannot constitutionally deprive an accused, whose life and liberty is at stake, of the assistance of counsel.

*Glasser v. United States,* 315 U.S. 60, 69, 62 S.Ct. 457, 464, 86 L.Ed. 680 (1942) (quoting *Johnson v. Zerbst,* 304 U.S. 458, 463, 58 S.Ct. 1019, 1022, 82 L.Ed. 1461 (1938)). This right is absolute, and therefore, must extend to all criminal defendants, regardless of the charge against them or their ability to pay for legal representation.[27]

25. I must note, however, that the inquiry under state law is more rigorous since it requires a finding that the evidence in the record was sufficient at law to prove the elements of the crime beyond a reasonable doubt. The distinction is subtle. The federal standard does not require a court "to ask itself whether *it* believes that the evidence at trial established guilt beyond a reasonable doubt." *Jackson v. Virginia, supra,* 443 U.S. at 318- 19, 99 S.Ct. at 2788 -89 (quoting *Woodby v. Immigration and Naturalization Service,* 385 U.S. 276, 282, 87 S.Ct. 483, 486, 17 L.Ed.2d 362 (1966) (Emphasis added).

It only requires the court to consider whether any rational fact-finder could have found such proof.

26. I adopt my previous statement of this evidence as if fully set forth herein. See Report and Recommendation at 11–12.

27. In the historic case of *Gideon v. Wainwright;* Justice Black stated: "The right of one charged with crime to counsel may not be deemed fundamental and essential to fair trials in some countries, but it is in ours. From the

In more recent vintage, the court has acknowledged that "[W]here a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest." *Wood v. Georgia,* 450 U.S. 261, 271, 101 S.Ct. 1097, 1103, 67 L.Ed.2d 220 (1981). This is because the "right to counsel guaranteed by the Sixth and Fourteenth amendments contemplates the service of an attorney devoted solely to the interests of his client." *United States ex rel. Hart v. Davenport,* 478 F.2d 203, 209 (3rd Cir.1973). The "mere physical presence of an attorney does not fulfill" this constitutional safeguard against the prosecutorial power of the state "when the advocate's conflicting obligations have effectively sealed his lips on crucial matters." *Holloway v. Arkansas,* 435 U.S. 475, 490, 98 S.Ct. 1173, 1181, 55 L.Ed.2d 426 (1978). If the right to counsel means anything less than "untrammeled" and "unimpaired" assistance, the value of the Sixth Amendment's protection is lost. See *Glasser v. United States,* 315 U.S. 60, 70, 62 S.Ct. 457, 465, 86 L.Ed. 680 (1942); *Smith v. Anderson,* 689 F.2d 59 (6th Cir.1982). With these precepts in mind, I embark on the discussion of the state of law after *Sullivan.*

*Glasser* and its progeny[28] gave birth to *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980) which answered two questions expressly reserved in *Holloway v. Arkansas, supra,* namely: (1) what affirmative duty does a trial judge have to assure that criminal defendants are not deprived of effective assistance of counsel by joint representation of conflicting interests, and (2) what showing of a conflict of interest must be made where there is no objection at trial before a court concludes that a defendant was deprived of effective assistance of counsel by virtue of joint represen-

tation. 435 U.S. at 483, 98 S.Ct. at 1178. Answering the first question the court held that absent special circumstances or objection at trial from which the court knew or should have known of the existence of a conflict, a trial judge is not compelled constitutionally to inquire into the propriety of multiple representation. The court also found no error in the trial judge's actions in this case. *Cuyler v. Sullivan, supra,* 446 U.S. at 347, 100 S.Ct. at 1717–18. The court's resolution of the second issue is of critical importance here.

Noting that the possibility of conflict of interest inheres in almost every instance of representation, the court rejected that standard utilized by Third Circuit since it would effectively preclude any instance of multiple representation even in a case where a " 'common defense [would] give strength against a common attack.' " *Id.* at 348, 100 S.Ct. at 1718 (quoting *Glasser v. United States, supra,* 315 U.S. at 92, 62 S.Ct. at 475 (Frankfurter, J., dissenting)). In its place the court held that "[I]n order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Id.* 446 U.S. at 348, 100 S.Ct. at 1718. And furthermore, the court stated that "a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." *Id.* at 349–50, 100 S.Ct. at 1719. Accordingly, it seems the court perceived a dual inquiry in multiple representation cases. The claimant must establish: (1) an actual conflict of interest; and (2) adverse effect on the lawyer's performance.[29] See *Parker v. Parratt,* 662 F.2d 479, 484 (8th Cir.), reh. *en banc* denied, (1981). But see *Baty v. Balkcom,*

---

very beginning, our state and national constitutions and laws have laid great emphasis on procedural and substantive safeguards designed to assure fair trials before impartial tribunals in which every defendant stands equal before the law. This noble ideal cannot be realized if the poor man charged with crime has to face his accusers without a lawyer to assist him." *Gideon v. Wainwright,* 372 U.S.

335, 344, 83 S.Ct. 792, 796–97, 9 L.Ed.2d 799 (1963).

**28.** See *Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978).

**29.** As discussed, *infra* at n. 34 and accompanying text this dual inquiry may merge into essentially one in some cases.

661 F.2d 391, 396 (5th Cir.), reh. *en banc* denied (1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 2307, 73 L.Ed.2d 1308 (1982).

As the Court of Appeals recently commented concerning the nature of these inquiries:

'Actual conflict of interest,' 'actual effect on the adequacy of representation' and 'prejudice' are concepts which the federal courts will be required to grapple with and refine on a case-by-case basis. They are difficult issues on the best of records.

*Briguglio v. United States,* 675 F.2d 81 (3rd Cir., 1982) (per curiam), now proceed to "grapple" with them in the context of this case.

In *Sullivan* the court did not define the phrase "actual conflict of interest." Justice Marshall's concurring and dissenting opinion, however, did offer some guidance. Drawing on the definition of the term in Cannon 6 of the Cannons of Professional Ethics (1937),[30] Justice Marshall distinguished a possible conflict from an actual conflict as follows:

There is a possibility of conflict, then, if the interests of the defendants *may diverge* at some point so as to place the attorney under inconsistent duties. There is an actual, relevant conflict of interests if, during the course of the representation, the defendants' interests *do diverge* with respect to a material factual or legal issue or to a course of action.

*Cuyler v. Sullivan, supra,* 446 U.S. at 356 n. 3, 100 S.Ct. at 1722 n. 3 (Marshall, J., dissenting). This position is consistent with the longstanding definition utilized by the Fifth Circuit.[31] Because of its relative ease in application to the facts of the instant case, I adopt it as the test for a conflict of interest.

The second prong of the test—adverse effect on counsel's performance—is more troublesome. The ambiguity of this language arises from the court's reference to *Glasser, supra,* and *Dukes v. Warden,* 406 U.S. 250, 92 S.Ct. 1551, 32 L.Ed.2d 45 (1972) to explain the nature of the adverse effect. After illustrating the distinction in the cases the court noted:

*Glasser* established that unconstitutional multiple representation is never harmless error. Once the court concluded that Glasser's lawyer had an actual conflict of interest, it refused 'to indulge in nice calculations as to the amount of prejudice' attributable to the conflict. The conflict itself demonstrated a denial of the 'right to have the effective assistance of counsel.' 315 U.S. at 76 [62 S.Ct. at 467]. Thus, a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief. See *Holloway, supra,* [435 U.S.] at 487–491 [98 S.Ct. at 1180–82]. But until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance. See *Glasser, supra,* [315 U.S.] at 72–75 [62 S.Ct. at 465–67].

*Cuyler v. Sullivan, supra,* 446 U.S. at 349–350, 100 S.Ct. at 1719 (footnote omitted). The language with its citation to *Holloway, supra,* seems to indicate that it contemplated only a showing of actual conflict to find a Sixth Amendment violation without any proof of adverse effect. On the other hand, it may be indicative of the court's attempt to draw a distinction between some adverse effect and a presumably higher standard of material prejudice. Justice Marshall recognized the difficulty with this language and its implications in his dissent. See 446 U.S. at 355–58, 100 S.Ct. at 1721–23 (Marshall, J., dissenting). His comments highlight the

---

**30.** The Cannons of Professional Ethics was superceded by the Code of Professional Responsibility. See Rule 5–105(A)–(D).

**31.** See *Turnquest v. Wainwright,* 651 F.2d 331, 333 (5th Cir.1981) which adopts the description of conflict of interest set forth in *Foxworth v. Wainwright,* 516 F.2d 1072, 1076 (5th Cir.

1975); "A conflict of interest is present whenever one defendant stands to gain significantly by counsel adducing probative evidence or advancing plausible arguments that are damaging to the cause of a co-defendant who counsel is also representing."

difficult task of proving prejudice or distinguishing adverse effect from prejudice.[32]

The ambiguity of the opinion on this point also manifests itself in the confusion in the decisions since *Sullivan.*[33] The division of opinion among the courts essentially falls into one of four categories: (1) proof of actual conflict is sufficient to establish a Sixth Amendment violation without proof of adverse effect; See *Baty v. Balkcom, supra,* 661 F.2d at 396; *Commonwealth v. Michel,* 381 Mass. 447, 409 N.E.2d 1293, 1298 n. 9 (1980) (the court seems to suggest that there is no distinction between adverse effect and prejudice); (2) proof of actual conflict, as opposed to a potential conflict, necessarily adversely affects counsel's performance; See *United States v. Hearst,* 638 F.2d 1190, 1194 (9th Cir.1980), *cert. denied,* 451 U.S. 938, 101 S.Ct. 2018, 68 L.Ed.2d 325 (1981); (3) proof of actual conflict and adverse effect is required; See *Parker v. Parratt, supra,* 662 F.2d at 484 (8th Cir.1981); *Camera v. Fogg,* 658 F.2d 80, 87–89 (2nd Cir.), *cert. denied,* 454 U.S. 1129, 102 S.Ct. 981, 71 L.Ed.2d 117 (1981); (4) proof of actual conflict must be accompanied by a showing of specific prejudice, See *United States v. Taylor,* 657 F.2d 92, 94 (6th Cir. 1981); *United States v. Halbert,* 640 F.2d 1000, 1010 (9th Cir.1981). Because the Court of Appeals appears to follow the strict language in the *Sullivan* case, and, thus adopts the majority position that both actual conflict and adverse effect must be proved, I need not speculate as to the relative merits of the contrasting positions. I am bound by its decision.

In *United States v. Laura,* 667 F.2d 365 (3rd Cir.1981), the appellant and her husband were both represented by the same attorney while under indictment for cocaine importation. Affidavits were submitted to the court indicating that the defendants were aware of the potential for conflict of interest, yet desired the same attorney.[34] The government voiced objection to joint representation. During the plea negotiations, appellant's attorney informed her that she would probably be acquitted if the case went to trial, but the plea bargain offer presented to all defendants were an "all or nothing" deal. If her husband went to trial, she was informed, that conviction was imminent together with the possibility of a protracted sentence. The attorney provided her information concerning the value of the agreement to her husband. Ultimately, appellant chose to plead guilty. On motions to vacate the sentence and change her plea, appellant raised the issue of conflict of interest. The district court denied the motions.

On appeal the Circuit Court purported to apply the *Sullivan* standard expressly noting that "[A]lthough the courts held that the defendant need not demonstrate prejudice resulting from inadequate representation, the court emphasized that 'the defendant must show that a conflict of interest actually affected the adequacy of his representation.'" *Id.* at 370 (quoting *Cuyler v. Sullivan, supra,* 446 U.S. at 349–50, 100 S.Ct. at 1719). After reviewing the record, the Court of Appeals held that even if an actual conflict existed, it did not affect the adequacy of appellant's representation because the attorney did nothing more than inform her of the probable consequences available at the plea stage. *Id.* at 371. Thus, the court found no evidence of the conflicts adverse effect on the lawyer's performance.[35]

---

**32.** See Note, *Cuyler v. Sullivan* And Proposed Rule 44(c): Contrasting Approaches to Conflicts of Interest in Multiple Representation of Criminal Defendants, 30 Cath.U.L.Rev. 103, 115 n. 65 (1980) ("The *distinction here, if one exists, is a very fine one."*).

**33.** See Conflicts of Interest in the Legal Profession, 94 Harv.L.Rev. 1244, 1390 (1981).

**34.** During a colloquy with the defense attorney, appellant waived her right to separate counsel.

**35.** Judge Stern, dissenting, vigorously disagreed with this characterization of the record as well as the majority's interpretation of the *Sullivan* standard. 667 F.2d at 375–76. Judge Stern did not read *Sullivan* as imposing a dual requirement of showing an actual conflict and an impact of that conflict on the representation. *Id.* at 376 n. 6. The jurist viewed an actual conflict as inherently affecting representation without the necessity of a showing of

Although the circumstances of *Laura* are manifestly different from the instant case, the Circuit Court's explication of the *Sullivan* standard is instructive.[36] The theory of *Sullivan,* to which our Court of Appeals and majority of cases subscribe, requires the finding of an actual conflict of interest which caused some lapse in representation contrary to the defendant's interests without requiring that such a lapse be outcome determinative.[37] That is—the conflict must cause the attorney to take action adverse to his client's interests but no showing of prejudice need be shown in the sense that the lapse in representation might have contributed to the conviction. See *Walker v. Garrington,* 521 F.Supp. 1313, 1319–20 (M.D. Tenn.1981). The Court of Appeals recently had occasion to emphasize this distinction in the context of conflicts of interest:

> The distinction between the 'deprivation' of a right and the 'prejudice' that may result thereupon is not a new one... Only an *actual* conflict of interest would establish [a Sixth Amendment violation]. The court carefully noted [in *Sullivan* ] that its requirement that a defendant show an actual conflict does not constitute a requirement that the defendant demonstrate prejudice [446 U.S.] at 349–50, 100 S.Ct. at 1718–19. A showing of that one has been 'deprived' of his right to effective counsel is a predicate to relief; a showing of 'prejudice' is not.

*Bailey v. Redman,* 657 F.2d 21, 24 (3rd Cir.1981), *cert. denied,* 454 U.S. 1153, 102 S.Ct. 1024, 71 L.Ed.2d 310 (1982). It is also exemplified in the different treatment accorded ordinary ineffective assistance of counsel claims which require some showing of prejudice. See *Washington v. Strick-*

land, 673 F.2d 879, 900–1 n. 25 (D.C.Cir. 1982). Where, however, a conflict of interest is shown to produce a course of action contrary to the interests of a criminal defendant, prejudice is presumed "because a defendant represented by a lawyer serving two clients with contradictory interests in effect is denied his right to counsel altogether." *United States v. Baynes,* 687 F.2d 659, 669 (3rd Cir.1982). See also, *United States v. Green,* 680 F.2d 183, 190 n. 12 (D.C.Cir.1982); *United States v. Alvarez,* 580 F.2d 1251, 1256 (5th Cir.1978). Furthermore, a growing line of cases in the other circuits have acknowledged *Sullivan's* admonition that that prejudice need not be shown to establish a Sixth Amendment violation. See e.g., *United States v. Heldt,* 668 F.2d 1238, 1277 n. 83 (D.C.Cir.1982), *cert. denied,* 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 440 (1982); *Brown v. United States,* 665 F.2d 271, 272–73 (9th Cir.1982); *United States v. Ramsey,* 661 F.2d 1013, 1018 (4th Cir.1981), *cert. denied,* 455 U.S. 1005, 102 S.Ct. 1642, 71 L.Ed.2d 874 (1982); *Baty v. Balkcom, supra,* 661 F.2d at 396–97; *Turnquest v. Wainwright,* 651 F.2d 331, 334 (8th Cir.1981); *Camera v. Fogg, supra,* 658 F.2d at 87; *United States ex rel. Williams v. Franzen,* 531 F.Supp. 292, 296–97 n. 8 (N.D.Ill.1981), *aff'd,* 687 F.2d 944 (7th Cir. 1982).

Petitioner presents a myriad of instances in which it is alleged a conflict of interest arose. It is unnecessary to discuss each claim at length because on this record the finding of one conflict of interest compels issuance of the Great Writ. But in order to facilitate appellate review I shall set forth my view as to each of the petitioner's claims.

prejudice. *Id.* at n. 8. Although I find much logic in this reasoning, the record before me fits closely enough into the *Sullivan* criteria to restrict deviation from it.

**36.** *Sullivan,* of course, deals with conflicts of interest which manifest at trial while *Laura* is directed to the plea negotiation stage. Judge Stern also correctly noted that in *Laura* the conflict was identified before trial. 667 F.2d at 375 (Stern, J., dissenting). The case is also complicated by the court's finding that the appellant waived her right to separate counsel.

**37.** In some instances a finding of actual conflict, necessarily leads on the conclusion of adverse effect for there can be a conflict only if the attorney chooses a course of action inconsistent with the interest of his client. Alternatively, the dual tier analysis may be a different way of distinguishing between a mere potential conflict and an actual conflict. *Honneus v. United States,* 509 F.Supp. 1135, 1139 n. 3 (D.Mass.1981). See also, *Baty v. Balkcom, supra,* 661 F.2d at 397 n. 3.

**1256**

Preliminarily, I find that petitioner's contention that a conflict of interest resulted in the defendant's failure to call several fact witnesses who were outside the building at the time of the killings without merit. In short, these witnesses were simply of no value to the defense of Sullivan or the co-defendants. Thus, I find no conflict of interest here because the interests of the defendants did not diverge with respect to any factual issue or course of action.

With regard to the failure to produce Michael Hession as a defense witness, I similarly find that a conflict of interest was not present. The interests of the defendants did not diverge with respect to the essence of Hession's testimony. While surely the testimony would have been helpful to Sullivan, it would not have been adverse to the other co-defendants.[38] Assuming arguendo that a conflict of interest existed, I find that it did not adversely affect the performance of counsel. Sullivan's attorneys were concerned solely with Hession's reliability as a witness because of his fear of testifying and for that reason alone decided against using his testimony. Thus, any conflict which existed did not affect the adequacy of representation.[39]

Finally, I find no conflict of interest in the decision to advise the petitioner not to testify. This advice was proffered after considering the potential adverse impact on the jury of certain facts which would be brought out by the prosecution on cross-examination. It was formulated because of the attorneys' belief that the evidence adduced at trial would compel a verdict of acquittal. Accordingly, I find that this advice, which the petitioner considered independently and agreed to, was a tactical decision designed to capitalize on a weak prosecution case; and not premised in any way on the consideration of the co-defendants.

The petitioner vigorously argues that the attorneys' decision not to call co-defendant Carchidi as a defense witness manifested an actual conflict of interest. Contrary to the respondent's suggestion, a review of the record demonstrates that there is much merit to this argument.

The Court of Appeals described the statement allegedly made by Carchidi to McGrath: "Get out of the building and don't say nothing,"[40] as a "critical thread of the Commonwealth's evidence." *United States ex rel. Sullivan v. Cuyler, supra,* 593 F.2d at 522. Indeed, the testimony was first mentioned in the prosecution's opening statement,[41] and emphasized no less than three times in its closing argument.[42] As I previously stated:

> "Counsel felt essentially that the only real inculpatory evidence against the petitioner was the testimony of McGrath. Had Carchidi testified, the essence of his testimony would have refuted much of McGrath's testimony. Specifically, Carchidi stated that he approached McGrath in the conference room on the night of the killings and told him that Hession wanted to talk to him about his absence from work. He would have denied telling McGrath to put off his cleaning until later. He also would have denied telling McGrath to get out of the building and say nothing immediately after the shots were fired."

Perhaps, this situation can best be described as a potential conflict.

---

**38.** I reiterate my finding that Peruto was not concerned about Hession's possible testimony placing Carchidi at the scene thereby negating his false alibi defense tactic. See *supra* at n. 19. Without this possibility the interests of the defendants did not differ because no damage could have been done to Carchidi's defense. See *Parker v. Parratt, supra,* 662 F.2d at 486.

**39.** I do not mean that the attorneys' conduct would not have been different had there been independent counsel, but that there is no credible evidence that the conflict caused the attorney to choose Carchidi over the petitioner.

**40.** Trial transcript at 844 (June 13, 1967). The trial judge ruled that the statement was admissible under the co-conspirator exception to the hearsay rule. Ultimately, the Pennsylvania Supreme Court concurred in this view. 472 Pa. at 159–60, 371 A.2d at 482–83.

**41.** Trial transcript at 82 (June 7, 1967).

**42.** Trial transcript at 1152, 1160 (June 19, 1967).

Supra, at p. 1249 (Citations omitted). Without doubt Carchidi's testimony would have been favorable to the defense, for only he could have refuted McGrath's statement. But Peruto perceived the danger of putting Carchidi on the witness stand well before the close of the prosecution's case. During the in chambers argument over the admissibility of Carchidi's statements to McGrath, Peruto stated to Judge Barbieri:

"You put me in this position; a statement by Carchidi offered into evidence and *can only be refuted by Carchidi.*

THE COURT: That is the law because a defendant refuses to testify he can't offer something.

MR. PERUTO: The defendant can testify, but how can he testify as to what Carchidi said and you *can't put Carchidi on the record.*"

Trial Transcript at 671 (June 13, 1967) (Emphasis added). DiBona was present throughout this exchange, thus, he was also aware of the problem. Moreover, while Peruto's testimony is inconsistent in many respects, his testimony in 1974 [43] reflects this concern as well as in 1982.[44] The inherent nature of the conflict between Carchidi's potential for self-incrimination and the probable exculpatory nature of his testimony for the defense is poignantly illustrated by Peruto's testimony on cross-examination as follows:

"Sir, you're not telling this court, are you, that if you had just represented Gregory Carchidi at the time of Sullivan's trial, you would have advised Carchidi to testify for Sullivan; are you?

A. That if I were only representing—

Q. Only representing Gregory Carchidi, who was awaiting trial for these 2 murders at the time of Sullivan's trial, isn't it a fact you would have urged him not to testify for Sullivan?

A. Yes, for the identical reasons that I didn't put it in Sullivan's case. But if I were representing Sullivan without Car-

chidi, I would have wanted that testimony of Carchidi."

Tr. at 37 (May 12, 1982).

Notwithstanding this revelation, it is apparent from the record that an actual conflict of interest manifested itself during petitioner's trial. The interests of Sullivan and Carchidi plainly diverged with respect to this course of action undertaken in petitioner's defense. Both attorneys owed a duty to consider the sufficiency of the evidence presented and the availability of exculpatory evidence before deciding to rest the defense. Both attorneys, however, owed a duty to Carchidi to protect him against possible self-incrimination since he too would shortly go on trial for the killings. The facts in the record establish that these duties of loyalty conflicted during petitioner's trial because the attorneys did not consider the interest of the petitioner in presenting this exculpatory evidence independently from the interest of the co-defendant in avoiding possible self-incrimination. In fact, on this record, the conflict could not be alluded. As Peruto aptly stated with regard to the presentation of Carchidi:

"Carchidi took the position of, hey, don't hurt me. If it's going to help John, yes, I'm willing to help John; but not if it is going to hurt me. So on the one hand I have to listen to John Sullivan, on the other hand I have to listen to Carchidi."

Tr. at 21–22 (May 12, 1982).

Both the minimal evidence presented by the prosecution and the interest of the co-defendant were interwoven in the decision to present no defense. As recently stated by Circuit Judge Heaney, "an actual conflict of interest occurs when counsel cannot use his or her best efforts to exonerate one defendant for fear of implicating the other." *United States v. Unger,* 665 F.2d 251, 255 (8th Cir.1981). This is plainly the dilemma petitioner's attorney faced at trial.[45]

**43.** P.C.H.A. at 100–101 (April 25, 1974).

**44.** Tr. at 20–21, 22 (May 12, 1982).

**45.** As cogently stated by Justice Brennan, "[T]he facts of this case demonstrate that ... the provision of separate trials does not always reduce the potential for conflict." *Cuyler v. Sullivan, supra,* 446 U.S. at 353 n. 3, 100 S.Ct.

In response to this obvious conflict of interest, respondent asserts that Carchidi never intended to testify in petitioner's defense. While I have found contrariwise, this is of no consequence. The focus here must be on the conflicting duties of the attorneys; not Carchidi's desire to help in the defense. This argument bespeaks of a claim of lack of prejudice which is not relevant to the issue of whether an actual conflict existed. Under our system of justice, petitioner had the right to have the decision not to present a defense made by counsel devoted solely to his interest. It is this divided loyalty of counsel in choosing a course of action which creates the conflict eviscerating the right to counsel here; not the probable cooperation of the co-defendant in providing a favorable defense.

Respondent's final argument is similarly unavailing. Simply stated, it is a claim of "no harm—no foul." Respondent contends that even if Sullivan and Carchidi were represented by independent counsel, such counsel would have advised Carchidi to invoke his Fifth Amendment right; thus, Carchidi would not have testified in any event. In support, respondent cites the following passage from *United States v. Martorano,* 457 F.Supp. 803 (D.Mass.1978); *rev'd,* 610 F.2d 36, *aff'd on reh. en banc,* 620 F.2d 912 (1st Cir.1980), *cert. denied,* 449 U.S. 952, 101 S.Ct. 356, 66 L.Ed.2d 216 (1981):[46]

> [I]f separate attorneys had represented [appellant] and [co-defendant], then there would have been no way that [appellant] could have required [co-defendant] to relinquish his Fifth Amendment right to stay off the witness stand. Therefore, [appellant] could not possibly have been prejudiced by joint representation as far as [his co-defendant's] testimony is concerned, because he would not have been

able to demand and obtain such testimony even had he been represented by a separate lawyer.

*Id.* at 808–09.

Preliminarily, it must be noted that *Martorano* is both factually distinguishable and not particularly relevant to the legal issue *sub judice.* Martorano was represented by the same law firm which represented his co-defendant, Halloran. At the co-defendant's arraignment, the magistrate questioned him about a possible conflict of interest in joint representation, and required counsel to inform each defendant of his right to separate counsel as well as file letters of waiver of that right with the court. Based upon these circumstances, the court found that Martorano executed a knowing waiver of his right to separate counsel. *Id.* at 807. Because of a technical violation of the First Circuit's rule in *United States v. Foster,* 469 F.2d 1 (1st Cir. 1972), requiring separate questioning of the petitioner as to his awareness of the risks of joint representation, the court found it necessary to consider whether "any prejudice resulted ... from joint representation." 457 F.Supp. at 807. With regard to the failure of his co-defendant to testify in his defense, the court held that no prejudice was evident because, (1) the trial strategy of defense counsel was not infected by any conflict of interest, (2) the co-defendant's testimony would not have been helpful, and (3) Martorano could not have compelled his co-defendant's testimony even if independent counsel were appointed. *Id.* at 808– 809. The Court of Appeals reversed on other grounds. *United States v. Martorano,* 610 F.2d 36, 42 (1st Cir.1979). On rehearing *en banc,* the court affirmed the decision of the district court. *United States v. Martorano,* 620 F.2d 912 (1st Cir.1980).[47]

---

at 1721 n. 3 (Brennan, J., concurring). As the testimony of McGrath became evident, counsel for the petitioner should have realized the interests of their clients conflicted.

**46.** *Respondent, however, neglected to inquire into the subsequent history of the case which the court uncovered sua sponte.*

**47.** Interestingly, the Court of Appeals' decision was rendered on the same day the Supreme Court decided Sullivan, May 12, 1980. Subsequently, the court declined the invitation to grant certiorari in the case, 449 U.S. 952, 101 S.Ct. 356, 66 L.Ed.2d 216 (1981). Of course, the denial of a petition for writ of certiorari neither creates binding precedent nor carries with it any implication of the views of the court

Noting that the ultimate question was whether any prejudice accrued from the joint representation, the court further defined the inquiry in terms of whether there was an actual conflict of interest which was likely to have subverted the defense. *Id.* at 915 n. 3. In discussing the failure to call the co-defendant to the stand the court accepted the district court's argument that no prejudice accrued because even with independent counsel, the co-defendant could not be compelled to forego his Fifth Amendment right not to testify if his interests dictated that he remain silent. *Id.* at 919. The court concluded that Martorano could not have been "prejudiced" by this tactical decision. *Id.*

The factual differences between *Martorano* and the case *sub judice* dictate distinct legal inquiries. Martorano was warned of the dangers of multiple representation, and chose to waive his right to separate counsel. Sullivan, of course, did not. The difficulty in *Martorano* was the trial judge's failure to adhere to the *Foster* rule in the First Circuit. This necessitated the inquiry of whether any prejudice resulted from the multiple representation. The court's application of this test required a finding of some subversion or lapse in the defense resulting from the conflict of interest. This inquiry is clearly outcome determinative. The court merely found no perceivable deleterious effect from multiple representation. The *Sullivan* standard does not require this affirmative showing of prejudice before a Sixth Amendment violation is found.[48] Accordingly, *Martorano, supra,* is neither controlling nor analogous.

Upon more circumspect analysis, it can be seen that the respondent's argument is merely an attempt to redefine the *Sullivan* standard in terms of prejudice. Respondent would have the court find that even if a conflict existed, the attorneys' conduct

and, therefore, the outcome of the trial would have been the same. But the language and theory of *Sullivan* preclude this inquiry. Once an actual conflict of interest is shown to adversely affect the attorney's performance, there is no need " 'to indulge in nice calculations as to the amount of prejudice' attributable to the conflict." *Cuyler v. Sullivan, supra,* 446 U.S. at 349, 100 S.Ct. at 1719 (quoting *Glasser v. United States,* 315 U.S. at 76, 62 S.Ct. at 467–68). Such an inquiry would require "unguided speculation." *Holloway v. Arkansas, supra,* 435 at 491, 98 S.Ct. at 1182. The constitutional infirmity in this instance of multiple representation simply arises from the conflicting interests of the defendants which in turn precluded petitioner's attorney from making a trial decision in the best interest of Sullivan *alone.*

In the instant case, a finding of adverse effect on counsels' performance necessarily follows from the finding of an actual conflict of interest. Counsel faced conflicting duties: to present exculpatory testimony in defense of the petitioner or prevent possible self-incrimination by the co-defendant. With their choice to rest the defense in consideration of the possibility of incrimination of Carchidi, the attorneys' performance was adversely affected. Furthermore, counsel even withheld commenting on their inability to call Carchidi as a witness. See *United States v. Provenzano,* 688 F.2d 194 at 198 (3rd Cir.1982). Thus, the conflict of interest directly affected the adequacy of petitioner's representation.

Moreover, the Court of Appeals has repeatedly reversed convictions where the Sixth Amendment right to unfettered representation was impaired by counsel's failure to call a co-defendant or other client for fear of possible incrimination on cross-examination. Cf., *United States v. Levy,* 577

on the merits of the case. See *Maryland v. Baltimore Radio Show, Inc.,* 338 U.S. 912, 919, 70 S.Ct. 252, 255, 94 L.Ed. 562 (1950) (Frankfurter, J.).

**48.** See discussion *infra* at n. 34 and accompanying text. The standard formulated in *Sullivan* is directed to the case where counsel did

nothing to advise the trial court of the possibility of a conflict. The trial court in *Martorano* specifically pointed out the possibility of a conflict but failed to question the defendant individually on his ability to waive his right to separate counsel. The necessity of showing prejudice is more compelling in the latter case.

F.2d 200, 211 (3rd Cir.1978) (risk of disclosure of former client's involvement in other drug transaction on cross-examination—requires reversal even under rule requiring a finding of prejudice); *United States v. Dolan,* 570 F.2d 1177, 1179 n. 2 (3rd Cir.1978) (in upholding district court's order that an attorney withdraw from representing both defendants, the court found an actual conflict of interest where an attorney would advise co-defendant not to testify based on privilege against self-incrimination). In *Dolan, supra,* the court recognized that the "possibility of prejudice lies in the realities of trial practice—a given course of action may be advantageous for one defendant but not the other." *Id.* at 1180 n. 4.

Furthermore, *Glasser* itself is illustrative of the problem of multiple representation in conspiracy cases. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1941). In *Glasser,* one attorney represented two co-defendants in a conspiracy case by order of the trial court after being informed of the possibility of conflicts of interest. During trial, counsel failed to cross-examine a government witness linking Glasser to the conspiracy. The court found this failure resulted from the desire to protect the co-defendant. Also, hearsay statements made by the co-defendant were admitted against Glasser. Counsel did not object to their admission despite his view before trial that such statements were not binding on Glasser. The objection was not offered by Glasser alone because it might have left the jury with the impression that the testimony was true as to co-defendant Kretske. The Court viewed this as indicative of counsel's "struggle to serve two masters." *Id.* at 75, 62 S.Ct. at 467. The court further cautioned that "[I]n conspiracy cases, where the liberal rules of evidence and the wide latitude accorded the prosecution may, and sometimes do, operate unfairly against an individual defendant, it is especially important that he be given the benefit of the undivided assistance of counsel...". The admonition became predictably relevant in petitioner's case for while counsel objected to the admission of Carchidi's hearsay testimony, they were nonetheless confronted with the struggle to serve two masters after its admission. *Sullivan* presents the same type of conflict of interest the court faced in *Glasser;* one step beyond. Glasser's attorney failed to object to the admission of the hearsay testimony to protect the co-defendant while Sullivan's attorneys objected to its admission yet failed to refute it to protect the co-defendant. Both situations illuminate the "cross-purposes" under which counsel were laboring. *Id.* at 73, 62 S.Ct. at 466.

In sum, I find that an actual conflict of interest is presented on this record and such conflict adversely affected counsels' performance.

I am not unmindful that the nature of federal habeas corpus is a "source of friction between state and federal courts." *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 770, 66 L.Ed.2d 722 (1981). But the court has also recognized that habeas corpus in the federal courts by one convicted of a criminal offense is a proper procedure "to safeguard the liberty of all persons within the jurisdiction of the United States against infringement through any violation of the Constitution." *Townsend v. Sain,* 372 U.S. 293, 311, 83 S.Ct. 745, 756, 9 L.Ed.2d 770 (1963) (quoting *Hawk v. Olson,* 326 U.S. 271, 274, 66 S.Ct. 116, 118, 90 L.Ed. 61 (1945). Particularly in cases such as this where the line between guilt and innocence is not altogether clear, the Sixth Amendment right to counsel becomes paramount.

> In all cases the constitutional safeguards are to be jealously preserved for the benefit of the accused, but especially is this true where the scales of justice may be delicately poised between guilt and innocence. Then error, which under some circumstances would not be ground for reversal, cannot be brushed aside as immaterial, since there is a real chance that it might have provided the slight impetus which swung the scales toward guilt.

*Glasser v. United States, supra,* 315 U.S. at 67, 62 S.Ct. at 463–64.

The words of now Senior Judge Davis are as pertinent now as when they were penned in 1966:

"We are dealing here with the life of an individual who stood to be incarcerated for [the rest of his natural life and has already been incarcerated the past 16 years]. His right to counsel under the Constitution is more than a formality, and to allow him to be represented by an attorney with such conflicting interests as existed here without his knowledgeable consent is little better than allowing him no lawyer at all. See *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). This situation is too fraught with the danger of prejudice, prejudice which the cold record might not indicate, that the mere existence of the conflict is sufficient to constitute a violation of relator's rights whether or not it in fact influences the attorney or the outcome of the case."

*United States ex rel. Miller v. Myers, supra,* 253 F.Supp. at 57.

For the foregoing reasons, I recommend that the petitioner was deprived of the assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution. His conviction cannot stand and the writ must issue.

### RECOMMENDATION

AND NOW, this 22nd day of October, 1982, IT IS RESPECTFULLY RECOMMENDED that:

1. The Findings and Recommendation of the United States Magistrate be approved and adopted.

2. The petition for writ of habeas corpus be Granted, the execution of the writ is to be stayed for a period of sixty (60) days from the date of the Order of the Court to allow the Commonwealth of Pennsylvania an opportunity to appeal as provided by law or to relist the Bill of Indictment for a speedy trial.